# Exhibit B

**Amnesty International USA**

# Saudi Arabia

### The Gulf and the Arabian Peninsula:

### Human rights fall victim to the "War on Terror"

A Poem for My Mother
by
Jamil

You ask me how my mother lives --
Please do not wait to hear.
You ask me how my mother lives --
Words cannot speak her tears.

I know not even where to start,
Which door might open to
The darkness in my mother's heart
Blacked out by censored cards.

My mother's heart remains a void
Yet papered round with pain
My mother's heart remains a void
Since Yassin went away.

Extract from a poem by Jamil whose brother, Yassin Qassim Muhammad Isma'il, a Yemeni national, is held in Guantánamo Bay, Cuba, by the US authorities. The poem was given to AI during a conference organized by the organization in Sana'a, Yemen, in April 2004.

**1.0 INTRODUCTION**
The impact of the so called "war on terror" (henceforth "war on terror") on human rights in the Gulf and the Arabian Peninsula has been profound and far reaching. Governments in the region and the US government have treated nationals and residents of the area with a disturbing disregard for the rule of law and fundamental human rights standards. The results have been mass arrests, prolonged detention without charge or trial, incommunicado detention, torture and ill-treatment, strict secrecy surrounding the fate and whereabouts of some detainees, and apparent extra-judicial killings. These human rights violations have had profound effects not only on individual victims but also on their relatives and the general human rights situation in the region.

Hundreds of detainees from dozens of countries have been held at the US Naval Base in

Guantánamo Bay, Cuba. Almost 600 detainees are still held there; more than a third are reported to come from the Gulf and the Arabian Peninsula. They have been held for over two years and denied the right to challenge the legality of their detention before an independent court or to talk to their families. Their relatives continue to face an uncertain future without any immediate prospect of justice. Relatives of the thousands of detainees in the region held by their own or neighbouring countries without charge or trial face similar abuses. Families of detainees find themselves in endless emotional turmoil, financial hardship, and stigmatized by association with crimes for which their relatives have not been charged, let alone convicted.

Such developments represent a real threat to human rights achievements in the Gulf and the Arabian Peninsula in recent years. Over the last decade the region as a whole witnessed noticeable growth in governmental and non-governmental human rights institutions coupled with increasing demands for greater respect of human rights. These achievements are increasingly in jeopardy in the context of the US-led "war on terror". Among activists in the Gulf and the Arabian Peninsula, the "war on terror" has been referred to as "the shirt of Uthman" - a valid cause used to legitimise injustice.(1) In the words of a Gulf human rights activist, "the war on terror is every despot's dream come true."

The findings of this report are based on research carried out by Amnesty International (AI) during January and February 2004 in Yemen and the Gulf states. The project researcher met families of detainees, former detainees, human rights activists, lawyers, and government officials. With this report AI aims to increase the pressure on the US authorities and governments in the Gulf and the Arabian Peninsula to take urgent steps to redress the situation and put an end to the abuses highlighted.

As a step in this direction AI and the Yemeni National Organization for the Defence of Rights and Freedoms (HOOD) organized a conference in Sana'a on 10 and 11 April 2004 - "*Human Rights for All*". The conference was attended by human rights activists from the Gulf, Yemen, Australia, Canada, the UK and the USA. Participants acknowledged the serious security challenges faced by governments and their duty to bring to justice anyone suspected of recognizably criminal offences. However, they warned that the pursuit of security and justice must not be conducted at the expense of human rights. They reaffirmed that it is only through stringent adherence to internationally agreed human rights principles that genuine security can be achieved.

## 2.0 THE LONG SHADOW OF GUANTÁNAMO BAY
*"He is alive, yet not there and there is no way to get to him. Even his letters stopped. There is no one to hear my complaint, except God."*
Suad al-'Abd al-Jalil, mother of Fawzi al-Odah, Kuwaiti detainee in Guantánamo Bay

Almost 600 detainees of around 40 nationalities are being held at the US Naval Base in Guantánamo Bay in Cuba. The identities and nationalities of some of them have emerged during the two and half years since prisoner transfers from Afghanistan to Guantánamo began in early January 2002, but even the largest list compiled so far (by the *Washington Post*, a US newspaper, in April 2004) only purports to identify around half of those who have been or are detained there. Meanwhile, the US Defense Department has maintained its silence on the identities of the

2

detainees, increasing anxiety among families and hindering attempts by home governments to defend the rights of their citizens.

Apart from three detainees, including one Yemeni, who were charged in February and June 2004 in preparation for trial by military commission, the detainees are held without charge or trial. None has been brought before a court so that they can challenge the lawfulness of their detention. The International Committee of the Red Cross (ICRC) is the only international organization that has had access to the detainees. Many organizations, individuals and governments have taken issue with the US authorities over the lack of legal process. The ICRC has also made public its concerns about the deterioration it has observed in the psychological health of many of the detainees as a result of this indefinite detention regime. There have been numerous suicide attempts among the detainees.

The families of the Guantánamo detainees are forced to endure the uncertainty of this long-term, indefinite detention of their loved ones held outside any legal framework and in an almost total information black-out. Families and communities in the Gulf and the Arabian Peninsula are disproportionately affected - more than a third of the detainees held in Guantánamo are believed to be from Bahrain, Kuwait, Qatar, Saudi Arabia and Yemen – with the latter two countries accounting for the two largest groups of detainees. Two of the first (and so far only) six Guantánamo detainees to be selected by President George W. Bush for possible trial by military commission – executive bodies with the power to hand down death sentences – are Yemeni. They and the other four have been held for months in solitary confinement in a separate part of Guantánamo, Camp Echo, away from the other detainees. This has raised serious additional concern for their psychological and physical health, particularly in the case of the detainees who do not speak English and therefore cannot even communicate with the guards stationed outside their cells.(2)

For the Guantánamo detainees, the only permitted communication with their families is in the form of letters transmitted via the ICRC. The latter has reported that as of March 2004 it had facilitated the exchange of around 8,500 messages between the detainees and their families (which works out at an average of approximately 10 letters per detainee over a period of more than two years). This system, however, cannot assuage the suffering caused by the lack of direct ongoing contact and official transparency. Families have reported long delays in receiving letters. Only one of the families AI delegates spoke to during the visit to Yemen and the Gulf States in January 2004 had received a letter in the previous five months. In April 2004 in Sana'a, the younger brother of Suhail 'Abdu Anam recalled that "in October 2002 my parents received a call from the International Committee of the Red Cross in Yemen. They said that Suhail was in Guantánamo and that they had a message from him. Since then we have only heard from him one more time." Many families believe that their letters do not always reach the detainees. In March 2003, 'Abd al-'Aziz Sayir al-Shammari, a Kuwaiti citizen, complained that he only received a letter every six months. His wife was surprised, "He always asks why don't you send letters? We always do."

In addition, the US authorities censor all correspondences. According to the authorities, the Guantánamo detainees "do not get newspapers, radio or televisions. They get mail. It is, in fact read. And if anything comes in that's censorable, we censor it."(3) This is likely to fuel the

3

families fears about what might be happening to their loved ones. In any event, they do not know how long they will be held, why they are being held, or what will happen next. The family of 19-year-old Sadiq Muhammad Isma'il from Yemen complained that the "letters which we received talk of family greetings such as tell everyone I send my *salam* and that I am well. But what we really want to know is the state of his health, how they are treating him over there, is he held in solitary confinement or a communal cell? Are his hands and feet tied? Is he held in an animal cage like the ones we see on TV? We cannot find out." In Sana'a, Yemen, in April 2004, the brother of Adil Saeed el Haj Obaid said, "We learned that he was in Guantánamo through the newspaper and then we received about 10 letters from him. The letters have been censored. This made us more afraid that something harmful was happening to him and they were trying to hide this." The brother of 'Abdul al-Khaliq al-Baidhani told AI that "his letters always come three or four months late, which makes us worry what they may be doing to him that we cannot see. He writes that he does not want human rights as much as he would like to have the same rights as animals. He said that he was 'tired, tired, tired, tired, tired, tired' (six times) of what he was going through. The last letter made us very afraid, because he had a pain in one eye and was not able to see out of it. My mother cries every day for him, and our sisters are very upset too. When his mother learned that he had lost sight in one eye, she left home and went to the mosque and would not come home from there for three days. His wife is emotionally and physically very sick because of worrying about him".

That the relatives of detainees held in Guantánamo are suffering was clear to delegates who attended the Sana'a "*Human Rights for All*" conference in April 2004. Numerous relatives came to the conference, and signed statements and affidavits. The following are extracts from some of their statements:

- "I am the brother of Saeed Ahmed al-Sarim who is being held in Guantánamo Bay… This has been very difficult on his wife and children. The children are always saying is my father coming home tomorrow? The youngest child waits every day by the door, saying her father is coming right now, but he never does come. It has been three years since they have used the word 'father' to anyone, which hurts them a great deal. Every day her grandfather gives the youngest money and she goes to buy something for her father, but in the end she had to eat it as he is not there."
- "I am…the uncle of Farouk Ali Ahmed Saif… Farouk's "disappearance" and detention at Guantánamo has had a significant adverse impact on our family. For a year and a half we didn't even know where he was. Learning that he was held at Guantánamo came as a great shock to us all. His mother and father have suffered the most. His mother is being treated for depression at Taiz hospital. Farouk's father too has been treated for depression. He has lost all hope of ever seeing him alive again. His brothers and sisters as well as myself all feel a deep sense of loss and hopelessness about his disappearance."
- "I am the father of Majid Mahmoud Ahmed… We received a letter from the Red Cross telling us he was in Guantánamo Bay… His mother's health is deteriorating and she has a heart problem as a result of worrying about her son. We all miss him very much."
- "I am the younger brother of Basheer Naser Ali al-Marwalh… In May 2002, seven months after we last heard from Basheer, my father received a call from the

International Committee of the Red Cross here in Yemen. They said they had a letter from Basheer and we should come and pick it up. The letter was a short message from Basheer to say that he was a prisoner at Guantánamo. None of us could believe this. Both my mother and father were hospitalized shortly after receiving the news of Basheer's imprisonment. My father was treated for severe depression in hospital for twenty-two days…"

- "I am the father of 'Abdel Malik 'Abdel Wahhab al-Rahabi… The family has suffered because Abdel Malik has been in Guantánamo Bay. We have received only limited correspondence from him, and we had not heard from him for nine months, before we recently received two letters, both censored and months old…"
- "I am the brother of 'Ali Ahmed Mohammed al-Razehi who is in Guantánamo Bay… We learned that my brother was in Guantánamo Bay from the newspaper. Then about six months later we received a letter from him through the Red Cross… This has been very hard on the family. We could not tell our mother that he was in prison, because she was sick. She died not knowing where her son was. My father is very upset about his son's situation, and prays for him all the time."
- "I am the brother of Jamal Mar'i… In November 2003, Jamal's messages [from Guantánamo] stopped coming. We don't know why. We have written to him asking why he is not writing, but to date have heard nothing… My mother has taken Jamal's disappearance the worst. She has developed high blood pressure and often sinks into bouts of very deep depression… Jamal's wife is beside herself with worry. His young children don't understand what has happened to their father and constantly ask where he is, why doesn't he call and when he is coming back home…"

The US authorities have shown little or no sympathy for the plight of the families of the detainees. Secretary of Defense Donald Rumsfeld when asked if there would ever be any future provision for relatives to visit the Guantánamo detainees replied, "Oh, I would doubt it… No, I would think that would be highly unlikely". (4) AI raised this situation in a memorandum to the US government in April 2002, pointing out that "the denial of access and information to families who are left in the dark about the legal status and other conditions pertaining to their relatives' detention… causes the families needless suffering".(5) More than two years later, the US government continues to act as if it views such suffering as the inevitable "collateral damage" of its "war on terror" detention policies.

The US administration has repeatedly claimed that detainees at Guantánamo Bay are being treated humanely. Such assurances have failed to allay the fears of families. As the mother of Kuwaiti detainee Fayz al-Kandari said, "they say they are treating them well, what nonsense. We have seen their pictures, tied up like animals although no charges have been brought against them."

The appalling images of the torture and cruel, inhuman or degrading treatment of Iraqi detainees at the hands of US soldiers can only have exacerbated the distress of the relatives of those held in legal limbo in Guantánamo.(6) Until photographic evidence of war crimes in Abu Ghraib prison emerged, the US authorities had been promoting the message that all detainees in Iraq were being treated humanely and in accordance with the Geneva Conventions. The US government

has made similar statements about the Guantánamo detainees, with the exception that it denies that the Guantánamo detainees are covered by the Geneva Conventions.(7)

Allegations made by detainees released from Guantánamo that they were subjected to cruel and humiliating treatment, particularly in US custody in Afghanistan prior to their transfer, are likely to increase the anxiety of the relatives of those still held in the Naval Base. In Sana'a in April 2004, the younger brother of Guantánamo detainee 'Ali Yahya Mahdi said, "Upon learning that Ali was a prisoner, we all felt an overwhelming sense of sadness. We are all afraid of what might happen to him especially now after reading the reports of how detainees are treated at Guantánamo in newspapers and seeing interviews with detainees who were released from the facility. These reports give us a very bleak picture of what might be happening to him."

Evidence of a link between the torture in Abu Ghraib prison and the visit to Iraq of the then commander of Guantánamo to make recommendations on how to exploit detainees for "actionable intelligence" will doubtless have further increased the fears of the families of those held in Guantánamo.(8)

With official avenues for obtaining news about their relatives blocked, families have been forced to rely on media reports and rumours. In a letter to AI, Jamil, brother of Yemeni Guantánamo detainee, Yassin Qassim Muhammad Isma'il, wrote, "Despite the fact that my mother neither reads nor writes, because she is illiterate, when she hears of news reports [about Guantánamo Bay] she follows it with intensity, whether that be on the radio or in the newspaper. It may surprise you to know that whenever a newspaper publishes an item about Guantánamo she runs to one of her children to read it to her, then she grabs the paper and keeps looking at it for so long, as if she is hoping that the paper might speak to her."
Most of the families first learned of their relatives' detention in the media or from friends who had heard on the news that prisoners from Afghanistan or Pakistan had been taken to Guantánamo Bay. Safyia, the wife of Abdallah Kamel al-Kandari, recalled, "On 3 January 2002 I read his name in the newspaper… I screamed - my husband is alive, my husband is alive. Ever since, I have collected files on everything concerning Guantánamo, every word ever written about Guantánamo."

The father of Bahraini Guantánamo detainee Salah 'Abd al-Rasul 'Ali al-Bulushi told AI, "The first we knew he was in Guantánamo is when a Ministry of Interior delegation visited Guantánamo in 2002. After their return to Bahrain they rang us around May or June 2002." Up to that point the family believed that Salah 'Abd al-Rasul 'Ali al-Bulushi was held in Afghanistan after being arrested in Pakistan.
The mother of 'Adel 'Abd al-Mohssin al-Zamil, another Kuwaiti detainee in Guantánamo, had a similar experience when the Kuwaiti daily *al-Watan* "published that Adel lost his hands and legs in Afghanistan… we lived in fear that this was the case until the Kuwaiti delegation… came back [from Guantánamo] and assured us that he has not been hurt… what disturbs us is that we know nothing. "
Families' attempts to find out about the conditions and fate of their relatives have so far failed. 'Abd al-'Aziz al-Rubaish, a Saudi Arabian teacher whose brother Ibrahim al-Rubaish is among those held in Guantánamo Bay, explained how a group of Saudi Arabian families went three times to the US Embassy in Riyadh but the ambassador refused to see them. "There is no one at

6

the American Embassy that can answer any of our questions. It is total darkness." The brother of Guantánamo detainee, Jamal Mar'i, told AI, "Together with my father and brothers we have attempted to get more information on the circumstances surrounding Jamal's arrest and detention by the United States at Guantánamo. We have attempted to meet with the United States ambassador to Yemen over five times now, the last occasion being in March 2004. He has refused all our requests. On at least 20 occasions now we have met with officials from the Yemeni Ministry of the Interior to see if we can find out anything from them. We have also written to the Minister of the Interior three times. We have received the same response to all our representations: they know nothing about Jamal's detention".

Muhammad Saleh Kahlah al-Marri, a Qatari citizen, has two brothers held as "enemy combatants" by the US authorities. The younger, Jarallah al-Marri, is held in Guantánamo Bay. His other brother, Ali Saleh Kahlah al-Marri, is to date the only foreign national designated as an "enemy combatant" and held on the US mainland. He was arrested in December 2001 after legally entering the USA with his wife and children on 10 September 2001, reportedly in order to study for a master's degree. He was initially held as a material witness in the investigation into the 11 September attacks on the Pentagon and World Trade Center. In January and February 2002 he was indicted on charges relating to credit card fraud and making false statements to the Federal Bureau of Investigation (FBI), charges to which he pleaded not guilty. On 23 June 2003, less than a month before Ali al-Marri was scheduled to be tried, President Bush announced in a one-page order that he had designated 'Ali al-Marri an "enemy combatant" and he was transferred from the control of the Department of Justice to in incommunicado solitary confinement in the Naval Consolidated Brig in Charleston, South Carolina. The ICRC is believed to have had access to him, but he still had had no access to his lawyer by the end of April 2004. He has had no access to his family, who told AI in January 2004, "All we know is that he is in a military camp somewhere in the USA, possibly North or South Carolina."

When the US authorities arrested 'Ali al-Marri, they also withheld the passport of his wife, a Saudi Arabian citizen. Muhammad says, "She remained sitting in a rented flat in the US for a year. She does not speak English, but without a passport she could not leave the US. Finally the Saudi Arabian embassy issued her with another passport and she returned to live with her family in Saudi Arabia." The family in Qatar had not told the mother that two of her sons were detained: "we could not tell their mother that your two sons are arrested and we do not know why…"

Secrecy and confusion are fuelling the fears of the families about the health and fate of the detainees. The father of Kuwaiti Guantánamo detainee 'Abd al-'Aziz Sayir al-Shammari echoed the feelings of helplessness of many of the families when he told AI, "The future has become a dark tunnel. We do not know what is happening; it paralyses the whole family."

## 3.0 THE ROLE OF HOME GOVERNMENTS AND US INVOLVEMENT

## 3.1 HOME GOVERNMENTS RESPONSIBILTY TOWARDS GUANTÁNAMO DETAINEES

Many of the families of the detainees' in Guantánamo Bay feel that their own governments are unwilling to defend the legal and human rights of the Guantánamo detainees.

The Kuwaiti government has been allowed to send two delegations to Guantánamo Bay in the last two years, in recognition of its particularly close ties with the US authorities. The first delegation in 2002 consisted of three military personnel. The second delegation visited in January 2004. The US authorities apparently refused a request that a Kuwaiti lawyer, 'Abdul Rahman al-Haroun, join the delegation of two military officers who visited Guantánamo Bay.

In January 2004 Amat al-'Aleem al-Suswa, Yemen's Minister for Human Rights, argued to AI delegates that such restrictions by the US authorities put home governments in a difficult position, "We are unable to do anything for the families of the detainees… it is all confusion and no one seems to know where it starts or where it ends." The Minister revealed that when the Yemeni government delegation met 27 of its nationals, they discovered that three of them were in fact not Yemenis and added that access to prisoners to the one and only Yemeni government delegation permitted to visit Guantánamo was "very brief." As of January 2004, the Yemeni authorities had not received lists of its nationals detained in Guantánamo from the US authorities.

The father of 'Issa 'Ali 'Abdallah al-Mirbati, complained that a Bahraini government delegation which visited the detainees in Guantánamo Bay "instead of returning to us with information about their conditions, the members came back with nothing new." He added that "the first time they returned from there, they came and searched my son's home looking for a notebook with names and phone numbers." (9) A Bahraini parliamentary delegation visiting the US Congress requested, but was denied permission to visit their nationals held in Guantánamo Bay. (10)

Some relatives have been interrogated or arrested because their own governments seem to view them as guilty by association. The brother of Guantánamo detainee 'Adel Kamel 'Abdallah Haji said that he and another of his brothers were interrogated by the Bahraini authorities after 'Adel was arrested in Pakistan. "The interrogation centred on the circumstances of 'Adel's travel to Pakistan. My brother Maher was interrogated by a Bahraini state security officer who then handed out the records to a foreign man, he could have been English or American. The interrogation took place in a state security office at the Ministry of Interior."

The father of Bahraini detainee Salah 'Abd al-Rasul 'Ali al-Bulushi reported that the family "met with the Bahraini Ministry of Foreign Affairs. They told us that America suggested to them that our sons return home on the condition they are detained indefinitely. The Bahraini government asked for the charges which would justify their continued detention and America did not present any. Based on that, the Bahraini government refused because it did not want trouble with the families of the detained."

In other countries Guantánamo Bay detainees returned to their governments have been detained. Walid Muhammad Shahir al-Qadasi, a 24 year-old Yemeni national who had been detained in Guantánamo Bay since 2002, was returned to Yemen at the beginning of April 2004. Upon arrival he was detained in the Political Security in Sana'a. An AI delegation was allowed access to him 11 days after his arrival in the Political Security prison. He told the delegation that his family had not been informed of his arrival in Yemen let alone visit him. The AI delegation asked prison staff why the family had not been informed of his whereabouts, but the only response it received was that "we will inform them". The delegation also asked for the reasons of

his continued detention as Walid had told AI that the US authorities in Guantánamo Bay told him that they had nothing against him. The prison staff said that they were investigating him. At the time of the delegation's meeting with Walid, he had no access to a lawyer or a judge and is believed to be still held under the same condition.

An uncle of a Guantánamo detainee told AI that the family "never contacted the Yemeni government with a complaint or a request. They never contacted us or cared. They do not even know who is or is not in Guantánamo. If we really pressed the state for a response on Guantánamo they are likely to arrest us."

The brother of 'Ali and Jarallah al-Marri acknowledged that the Qatari authorities hired a US lawyer "but as it appeared that [my brothers'] detention is indefinite and that even their lawyer had no access to them, they let go of the lawyer. They told us it was useless… when we tried to engage an American lawyer ourselves they demanded US$10,000 a month. We cannot afford that." Reflecting a widespread feeling of disappointment in all government bodies, he added "I do not try in any way to contact the US government; it is useless to do so. If we went to the US to ask for rights they would detain us. Who is to defend us then?" The home governments credibility is undermined by their own pursuit of the "war on terror' with disturbing disregard for the rule of law and international human rights standards.

## 3.2 THE RULE OF LAW SIDELINED IN THE NAME OF SECURITY
***"The fight against terrorism cannot be a wild, unjust war. A conflict between the security interests of the executive and the rights to defence of the accused cannot be resolved to the disadvantage of the accused."***
German Judge Klaus Tolksdorf.(11)

In the 1990s governments in the Gulf and the Arabian Peninsula began to respond positively to pressure for human rights change and move away from the routine gross human rights violations which plagued the region for decades. Most governments in the area have embraced the human rights discourse, became state parties to international human rights conventions or established government human rights commissions or ministries. In some countries certain national laws which did not conform to international human rights standards have been abrogated. Other countries have allowed and encouraged the growth of non-governmental human rights organizations, and engaged in dialogue with the UN human rights mechanisms and international non-governmental human rights organizations. This progress has been a welcome achievement, militating in favour of respect for the rule of law and international human rights standards against the old practices of arbitrary arrest, incommunicado detention, indefinite detention without charge or trial, unfair trial, torture, and "disappearances". However, the "war on terror" has once again titled the balance in this struggle in favour of the old practices. When challenged on their human rights records, governments invoke US practices as justification. Some defend such violations as an attempt to shield their citizens from the harsher treatment by the US authorities.

Many in the Gulf and the Arabian Peninsula find themselves victims of an open-ended and borderless "war" conducted by security forces in the name of security. It is difficult to give an accurate figure for those detained as part of the "war on terror" because of the intense secrecy

and fear which surround the justice system and security services in several of these countries, but it is believed to be thousands of people.

In the United Arab Emirates (UAE), for example, relatives of those recently detained did not want their cases reported because of possible reprisals by the federal security forces in Abu Dhabi. Meanwhile, in the UAE the climate of fear is being reinforced by continuing arrests and detention of many people including military personnel and judges. In the aftermath of 11 September 2001, over 250 people were arrested and detained. AI does not know the exact number of those who continue to be detained. However the organization has received reports that they are held without access to lawyers or family and their legal status is unclear.

Saudi Arabian authorities have publicly stated that they had detained thousands of suspected members and sympathizers of *al-Qa'ida* in their pursuit of the "war on terror". Tensions have been heightened since May 2003 following violent attacks, including bombing and killings by armed groups and gunmen.(12) AI does not know the exact number of people who continue to be detained in this context and does not have details about the condition of their detention. The Saudi Arabian criminal justice system is characterized by secrecy and a history of gross human rights violations including the use of torture to extract confessions.(13) The Saudi Arabian authorities have consistently refused to allow human rights monitors access to places of detention. This secrecy and lack of accountability can only increase fears that those detained are at risk of serious violations.(14)

'Abd al-Raheem al-Mirbati, a 42-year-old Bahraini national living in Saudi Arabia with his wife and six children, was among those arrested. His wife told AI that in February 2004, 'Abd al-Raheem had answered a knock on the door at around 11pm. He was immediately handcuffed and around 40 officers – some in uniform – entered the house and searched it for nearly three hours. She said, "They did not explain the reason for the search… they only asked if anyone had visited us during the past few days… they took 'Abd al-Raheem without any explanation and I did not know what to do…" He is believed to continue to be held without charge or trial and without access to lawyers.

Khaled al-'Ibaidli, a 39-year-old father of six, was asked to report to the Qatari state security forces in August 2003. His brother told AI that Khaled was taken to a state security prison in the industrial area of Ibn Imran in Doha; no reasons were given. Khaled was allowed to call his brother, and his family were able to visit him regularly. However, when the family tried to find out why Khaled had been detained, the authorities refused to give them a clear answer. Finally, Khaled's father and brother went to the Public Prosecutor's Office and were told that he was detained "in the public interest". He has since been released uncharged or tried but at least six other people held under similar circumstances continue to be detained.

Eighteen-year-old Najib al-Hijri from the Yemeni province of Ibb was captured by the Iranian authorities as he attempted to flee Pakistan in 2001 or 2002 and imprisoned for a month before being extradited to Yemen. For months the family did not know what had happened to him. "When he first arrived [in Yemen] he was detained in solitary confinement and could not contact anyone," his brother explained. He added, "When I went to the state security in Ibb and asked

them to tell me where my brother was, they began to interrogate me." The family only found out seven months later that Najib was being held in Ibb and were subsequently allowed to visit him.

## 3.3 INTERFERENCE IN THE JUDICIAL PROCESS

On 6 June 2004 about a dozen detainees appeared before a court in Sana'a charged in connection with the October 2000 attack on the *USS Cole* in the port of Aden which resulted in the death of 17 US soldiers. The next day, 7 June, the trial was adjourned for a month. Defendants in the case have been awaiting trial since their arrest in the wake of the attack in October 2000. One of the main reasons for their prolonged detention is interference by US authorities.

The Yemeni Attorney General told AI in January 2004 that his office had requested that those detained be transferred to the custody of the judicial authorities. He said that a parliamentary committee had made a similar recommendation and that the Minister of the Interior had promised to refer those still remaining in detention to the judicial authorities. The Deputy Head of the Political Security told AI that they had "no proof that all of those detained in connection with the *USS Cole* attacks were implicated in the attacks." Yet, the men remain detained because, according to the Yemeni Minister for Human Rights, "whenever we decide to start legal proceedings… the US tells us that if they are tried, evidence would be lost." She did not elaborate on what that meant. In January 2004, the Political Officer at the US embassy in Sana'a acknowledged to an AI delegation that the US authorities had asked for the delay of this trial but in September 2002 it informed the Yemeni government that it had no further interest in those detained in this case and that the trial could go ahead.

Whatever the merits of the claim and counter claim between the two authorities, the delay of the trial has caused much anguish to relatives of the detainees. One of the detainees in this case is 'Abdallah al-Hakem, a 21-year-old taxi driver. 'Abdallah's mother has asked for a public trial for her son, "Let them make a decision, but he cannot just remain like that… My son did not commit a crime, there must be a solution, either he is innocent, or convict him… but what kills us is that we do not know." Beside this case, the Yemeni security forces have carried out the arrest of hundreds of people, including children, since 11 September 2001. Many have been released but over 200 remain held without charge or trial and without access to lawyers or the judiciary to challenge the legality of their detention.

Prolonged detention without charge or trial has been justified as protecting citizens from a worse fate at the hands of US justice as exemplified at Guantánamo Bay and elsewhere rather than on a criminal basis. A Qatari lawyer claimed that the relatives of six nationals detained as part of the "war on terror" in Qatar were told by the authorities that they were imprisoned because "we are worried for their sake about the Americans." A Yemeni Political Security official told AI that they are "choosing to detain people in Yemen where they can at least make sure they have a basic level of good treatment in relation to family visits, etc."

Noor, the mother of Yemeni detainee Ahmed al-Khidr al-Baidhani, told AI that her son was arrested and convicted of stealing a car before 11 September 2001. He was sentenced to 12 years in prison. She says she "understood he should be imprisoned for the wrong he had done… One Thursday I went to visit him at the central prison and asked for Ahmed al-Khidr. When he did not show up… I figured he was unruly, for sometimes when he misbehaved they tied him up and

refused me visits. The next day, Friday, I inquired about him and the officer told me 'your son has been transferred with two of his friends to the Political Security.' I then went to the Political Security but they denied he was there."

A lawyer who worked on the case described the treatment of Ahmed al-Khidr al-Baidhani as "a scandal for both Yemeni and American governments. The Americans put out his name... in a list of those at large but wanted for planning 11 September. Although they knew that [Ahmed] was in jail at the time, the Yemeni authorities transferred him to the Political Security Prison, just to appease the US and show it is cooperating in the war on terror."

Noor described her ordeal, "I spent 15 days looking for him until someone told me to go and see al-Sarmi (former Deputy Head of the Political Security) in person. I remained at the door until he appeared and then he told me 'we are keeping them, so America does not take them'."

Ahmed al-Khidr al-Baidhani's mother told AI that at the Political Security Prison her son was kept in solitary confinement with his feet shackled for a month before the family was allowed to visit him. Soon afterwards her other son, Salah al-Khidr al-Baidhani, was also detained, "They arrested him at midnight and detained him for a whole year in the Political Security… in the interrogations they asked him, 'Does your brother keep in touch with anyone?' Finally they just let him go after wasting a whole year and a half of his life…"

The authorities' disregard for the rule of law is having a profound effect on the lives of those they detain and those they condemn to wait for their trial or release. The families continue to face uncertainty and injustice with no chance of redress. The detention of her two sons, the main breadwinners, by the Political Security has devastated Noor's life. "I sold all my gold and that of my daughters to pay for what is happening to us, then I had to mortgage our home... Now I have nothing left… I made my three daughters leave school and sit home to sew..."

## 3.4 CROSS-BORDER ABUSES
A web of security cooperation agreements links governments in the Gulf and the Arabian Peninsula with each other and with governments outside the area. These agreements disregard international human rights standards. The "war on terror" has widened the net of such cooperation and provided a convenient pretext for a spate of security force operations in the region. Grave human rights violations, including apparent extra-judicial executions, have been committed with the explicit or implicit support of governments.

In November 2002, AI called for an urgent investigation into the deaths of six men, killed when a missile launched by a CIA-controlled Predator drone aircraft hit their car. The men were alleged to belong to *al-Qa'ida* and included 'Ali Qa'id Sinan al-Harithi, a Yemeni national. (15) No investigation has been carried out and the Yemeni authorities said they had agreed to cooperate in the killing.

On 9 September 2002, 'Abd al-Salam al-Hiyla, a 32-year-old Yemeni businessman and former high ranking officer in the Yemeni Political Security, travelled to Egypt on a 15-day business trip but has not returned to his family. His fate and whereabouts remain shrouded in secrecy. His family believe that he may have been suspected of having links with Muslim volunteers who

went to Afghanistan in the 1980s to fight the soviet forces occupying the country at the time. His brother told AI that on the day 'Abd al-Salam was due to return home "contact with him suddenly stopped… when we called him, his mobile rang but there was no answer."

The family's search for 'Abd al-Salam has so far proved inconclusive. They have told AI that they have received conflicting information as to his whereabouts. Some sources have apparently told them that he was held in Guantánamo Bay, while other sources suggested that he was being detained in Egypt. However, according to the family, the Egyptian embassy in Sana'a had told them that 'Abd al-Salam left Egypt on "a special American plane that took him to Baku, Azerbaijan," The family continue to live with the anxiety of not hearing from him since his travel to Egypt and not knowing his fate and whereabouts. They feel that the Yemeni government appears not to have pursued the case actively with either the Egyptian or the US authorities.

The suffering caused by cross border abuses is not limited only to relatives of detainees living in the Gulf and the Arabian Peninsula. One example is that of the Abu 'Ali family from the USA. They are US nationals of Palestinian origin. Their 23-year-old son, Ahmed Abu 'Ali has been studying at al-Madina University in Saudi Arabia. On 11 June 2003 he was reportedly sitting his final examination when Saudi Arabian security officers walked into the examination hall and arrested him. The family told AI that five days after Ahmed's arrest their house in Falls Church, Virginia, USA, was raided by 15 FBI agents and that according to the search warrant they were looking for material related to a court case in Virginia involving 11 people charged with terrorism related offences and known as U.S. v Royer.

FBI agents are reported to have either interrogated Ahmed or attended his interrogation by Saudi Arabian officers. They allegedly have threatened him with either being declared an "enemy combatant" and sent to Guantánamo Bay, or a trial in Saudi Arabia where he would have no legal assistance, public hearing or appeal to a higher tribunal. Ahmed has not been charged in the U.S v Royer case, but has been linked to one of the 11 defendants, Sabri Benkahla. During the trial hearings of the 11, the prosecutor referred to Sabri Benkahla as having contacts with Ahmed Abu 'Ali whom he described as an *al-Qa'ida* member. The prosecutor was also reported to have said that Ahmed was arrested in Saudi Arabia in connection with the bombings which took place in Riyadh on 12 May 2003. However, Sabri Benkahla has been acquitted and neither the US nor the Saudi Arabian authorities are understood to have brought any charges against Ahmed.

Nevertheless, Ahmed's legal status remains unclear and his family's anxiety is aggravated further by the secrecy which surrounds Saudi Arabia's criminal justice system, particularly the lack of access to legal assistance. According to the family, the Director of *al-Hair* Prison in Riyadh, where Ahmed is thought to be detained, has informed the US embassy in Riyadh that Saudi Arabia was ready to hand Ahmed over at any time to the US authorities if a request was made to this effect.

AI sought clarification from the US embassy in Riyadh as to the legal status of Ahmed and received a response stating "Due to the Privacy Act restrictions in this case, I cannot go into details on the current status of Mr Abu Ali's incarceration". For the embassy to provide details on the case Ahmed would have to sign a Privacy Act Waiver Authorization (PAWA) and return it to the embassy. Embassy staff are said to have provided a PAWA form to Saudi Arabian security

13

officers in July 2003, but not directly to Ahmed. This apparently happened at the insistence of Saudi Arabian security officers. AI has received information suggesting that Ahmed has not received the PAWA. For almost a year Ahmed's family worked tirelessly to seek justice for him, including by enlisting the support of their congressman, but the wall of secrecy of the Saudi Arabian criminal justice system coupled with the FBI involvement has proved too difficult to overcome. On 17 May 2003, the family wrote an appeal to President George W. Bush seeking help. The closing paragraph of the appeal read - "Mr President, The agony, pain, suffering, and humiliation that Ahmed and we… have endured in the past year are unbearable and indescribable. We trust your judgement and swift action to utilize all the power and prestige of your office to immediately secure Ahmed's release and safe return to the family home in Virginia and to put an end to our pain". Like the family of 'Abd al-Salam al-Hiyla and many other victims of cross border abuse to-date they have received no response.

This pattern of human rights violations continues unabated. Five Saudi Arabian nationals returned to Saudi Arabia from Guantánamo Bay last year were locked up upon arrival and their legal status remains shrouded in secrecy. In February 2004, the Iranian ambassador to Saudi Arabia was reported in the press as saying that "Iran has extradited people suspected of belonging to *al-Qai'da* to Saudi Arabia.".(16) In April 2004 the Qatari authorities handed over to the government of Yemen two Yemeni nationals who were arrested in Qatar last year and detained for months. Yemeni nationals have also been forcibly returned to Yemen from Saudi Arabia, Oman and other countries. The Yemeni authorities have in turn forcibly returned many people to countries such as Saudi Arabia. None of those forcibly returned in all these cases were known to have been allowed access to legal assistance or offered the opportunity to challenge their forcible return to other countries on the grounds that they would be at risk of serious human rights violations, including torture. Such exchanges of suspects between countries in the region and beyond has intensified with the pursuit of the "war on terror" unchecked by the rule of law and international human rights standards. The Arab Convention for the Suppression of Terrorism, which allows for forcible transfers of suspects without any guarantee that they will not face grave human rights abuses, has facilitated such operations and eroded international human rights protection.(17)

## 3.5 'REPEATEDLY CRUSHED'

For some among the families of the detainees, their ordeal at the hands of the US authorities and governments in the region comes after years of repeated suffering. Nouf al-Shammari explained how her first husband died after being tortured by the Iraqi security forces during the occupation of Kuwait in 1990. "I had only been married for two years… there was the occupation and the blow of my husband's death… all too much to bear." Two years later Nouf re-married. Her second husband, 'Abd al-'Aziz Sayir al-Shammari, is now detained in Guantánamo Bay. Nouf described herself as "repeatedly crushed by injustices" and finds the uncertainty of not knowing what will happen to her husband particularly difficult to bear.

'Aisha Hodic from Bosnia now living in Kuwait told AI, "I was with my first husband for only four months… before he was killed by a Croatian shell during a bombing raid on our village." 'Aisha's second husband Umar Rajab Muhammad Amin, a 36-year-old Kuwaiti engineer, is now held in Guantánamo Bay. Their five children are all suffering because of his absence, but the family is particularly concerned about nine-year-old Talha, 'Aisha's son by her first husband.

Talha is not a Kuwaiti citizen and so is not eligible for state schools. The family are worried that they will not be able to pay for his education, now that Umar is unable to provide for him.

Much of the responsibility for caring for the children has fallen to Umar's mother; 'Aisha has a limited knowledge of Arabic and suffers from stress. Faced with her new responsibilities, Umar's mother told AI, "Is there a night that passes in which we do not weep? Who will take care of his young children now?"

Even in the wealthier societies many families of detainees face financial hardship. For example, Kuwait's Labour Law stipulates that after 15 days' unexplained absence, an employee is automatically fired. The Kuwaiti government refuses to formally acknowledge the detention of its nationals in Guantánamo Bay. As a result many families of Kuwaiti Guantánamo detainees have lost their main source of income because they are classified as absent from work without good reason. For example, the government is no longer paying the salary of Umar Rajab Muhammad Amin because his absence from work is recorded as "unexplained absence".

Aiygul, the Azeri wife of Sami Muhi al-Din al-Haj, a Sudanese cameraman for the Qatari based *al-Jazeera* television news channel, has no immediate relatives in Qatar, apart from her three-year-old son. "I did not know there was so much pain and injustice in the world," she said. Aigul is grateful, however, because so far *al-Jazeera* has paid Sami's salary and the rent.

Guantánamo casts a long shadow particularly on women in the families of those detained. The wife of Abdallah Kamel al-Kandri explained how because Kuwaiti law requires her husband's approval in many situations, his enforced absence has far-reaching effects on her, "Even when I delivered Fatima on 3 February 2002, I could not be discharged from hospital until my husband signed. Fatima's uncle, Mansur, had to sign on behalf of his brother in order for us to leave."

Yassin Qassim Isma'il's brother wrote to AI of his mother's suffering in Yemen, "At every happy occasion which the family celebrates, the wound of this mother bleeds again. What are supposed to be joyous occasions become times of grief because she sees his siblings around her and wonders how difficult it may be for her imprisoned son."

## 4.0 GENERATING FEAR
Governments are also using the "war on terror" in more insidious ways to continue the old practices of restricting freedom of expression, belief, and association.

In the UAE, for example, those perceived to have Islamic tendencies, including lawyers, judges, teachers and university professors face restrictions on work opportunities and participation in public life. Prominent public figures perceived as critics of the state exercise extreme caution when writing in the press, or taking part in television and radio programs in order to avoid reprisal by security forces. Some are said to have been warned not to participate in seminars and public events.

Increasingly organizations such as teachers', lawyers' and journalists' associations have faced harassment because some of their board members hold "Islamist views". According to reports received by AI, in June 2002, 57 people were forced to leave their jobs in the Ministry of

Education: 33 were forcibly retired and 24 were transferred to other ministries. One source told AI that "the average age of those forcibly retired is between 35-37 years and most of them are exceptional educators who never expressed any extremist or intolerant views." One source told AI that since 2002 state security approval is required for the appointment of school head teachers in the UAE.

On 16 March 2004, Saudi Arabian security forces detained 13 scholars and activists for voicing their opinions on government educational reforms. These included university professors 'Abdullah al-Hamid, Dr Tawfiq Qussayer, Dr Matrouk Faleh, and Mohammed Said Tayyib, a former publisher. Dr Tawfiq Qussayer and Mohammed Said Tayyib were released in April 2004 after they signed pledges vowing not to carry out "political activity" and that they would liaise with the authorities before carrying out public activities. 'Abdullah al-Hamid, Dr Matrouk Faleh and at least two others remain detained without charge or trial after they reportedly refused to sign the pledge.(18)

In Yemen the authorities have adopted a more subtle approach. Hundreds of detainees perceived by security forces to hold "extremist Islamic views" have been held without charge or trial and engaged in religious dialogue with Islamic figures in order to make them renounce their views. Those who renounced their views are made to sign an undertaking that they had changed their views and are then released. Their release is, however, accompanied by restrictions which include regular reporting to police, prohibition of travel outside the area where they live as well as contact with others, particularly journalists, without permission from security forces.

Many in the region note the price and the far-reaching consequences of past government interference in religion. A board member of the Yemeni teachers' association told AI, "It was King Saud University in Riyadh, the Americans and Saudi Arabian governments, who convinced young men to go to Afghanistan… they used to give them financial help and tell them it is their duty to fight… Many who travelled [to Afghanistan] did not go because they belonged to a school of thought or because they planned to become terrorists; they went because they convinced them they were fighting for the freedom of Muslims."

More than 250 members of the Zaidi Shi'a community were arrested in the Yemeni capital, Sana'a, at the time of AI's visit in early January 2004. They were detained in the political security jails for chanting anti-US slogans after Friday prayers in the Grand Mosque in Sana'a. A fresh wave of arrests followed on 16 January.(19) The mosque arrests are reported to have started in May 2003 and were linked to protests against the US-led bombing of Iraq. Some of those detained were held for several months; others were released after a few days. None of those detained was ever charged, tried or given access to a lawyer. Many detainees reported that they were interrogated by Political Security agents.

When AI raised the mosque detentions with the Yemeni Attorney General, he expressed surprise that anyone was jailed in connection with chanting slogans. He stressed that his office worked most closely with the Ministry of the Interior but that the Political Security was an independent body outside his jurisdiction. Sheikh Murtadha bin Zaid al-Muhatwari, a renowned Zaidi Shi'a imam, had access to the detainees and said that he had seen "about a hundred of those in prison." He also confirmed that "an 11-year-old boy who was arrested four times" was among the

detainees.

'Ali Sharaf al-Din, who was detained three times for shouting slogans in the Grand Mosque, told AI that the authorities failed to inform any of the relatives of the detainees of their arrests.

Many families of juvenile detainees signed undertakings promising that the children would not repeat chanting such slogans. Sixteen-year-old Mut'i Hassan Nasser Munif was detained in the Political Security Prison in Sana'a for six weeks and then transferred to *Umran* Prison where he was detained for a further seven months. He told AI, "We were not tortured but sometimes we could not pray *fajr* (the first morning prayer) for about 15 days, as we had restricted use of the bathroom,(20) to pressure us into promising not to chant." In the end his family signed the undertaking.

In Saudi Arabia all forms of protest are severely restricted. Activists who organized a march to demand accelerated reforms, which was planned to coincide with a government sponsored human rights conference in October 2003, were quickly suppressed by security forces. About 270 were arrested, most of them were released after questioning but at least 83 were detained. Three of them were women, including a mother, Um Sa'ud, who carried a banner about her son, Sa'ud, who died during the fire which occurred at *al-Hair* Prison a month earlier. The government announced later that it had sentenced the detainees to 55 days' imprisonment. They were believed to have been released in December 2003, but how they were sentenced remains shrouded in the secrecy of the criminal justice system. AI fears that they may have been prisoners of conscience.

Emerging press freedom is under threat. Journalists in the Gulf and the Arabian Peninsula report increased harassment and fear that they will be detained on the pretext that they "support terrorism".(21)

A Yemeni journalist, posing as the relative of a detainee held as part of the "war on terror", published a series of eyewitness reports from Political Security prisons that brought to public attention grave violations of detainees' rights. Another Yemeni journalist working for *al-Shura* painstakingly followed the fate of the mosque detainees in Sana'a, each week exposing new arrests which he had unearthed. A Yemeni member of parliament told AI that "nowadays, it is the press that effectively shield and influence human rights." The risks faced by journalists can be demonstrated by the case of Muhammed al-Qiri, a journalist with the Yemeni English language paper The Yemen Observer. On 26 March 2004, Muhammed al-Qiri went to the Grand Mosque to observe arrests being made by members of the Political Security. He was seen by those making the arrests taking pictures of them. They attacked him physically leaving him with a bruised and bleeding face then took him into custody. He was interrogated and beaten before being released the following day after signing an undertaking not to take pictures of arrests in future.

Satellite news channels emerging as genuine forums for discussion and important sources of information, find themselves threatened by both Gulf governments and the US administration. According to an editor with the Qatari *al-Jazeera* TV, some US authorities have made threatening pronouncements against the television news channels *al-Jazeera* and *al-Arabiya*.

Youssef al-Shuli told AI, "An American officer told one of our journalists in Iraq that *al-Jazeera* was a legitimate target." (22) US missiles hit *al-Jazeera* offices in Afghanistan and Iraq; Tariq Ayoub, a reporter, was killed on 8 April 2003 in the Iraq attack. Sami al-Haj, an *al-Jazeera* cameraman in Afghanistan, was arrested and subsequently transferred to Guantánamo Bay, where he remains (see section 3.5 Repeatedly Crushed).

Taiseer 'Alouni, an *al-Jazeera* correspondent in Spain, was arrested on charges of "terrorism". He told AI that he believes the charges against him were based on "the nature of my work for *al-Jazeera.*" Taiseer 'Alouni believes that *al-Jazeera* was targeted because, "We were the only TV station transmitting from Afghanistan during the American bombardment and we showed the human cost of this."

Governments in the Gulf and the Arabian Peninsula have also tried to restrict *al-Jazeera*'s reporting. For example, in May 2002 Bahrain declared *al-Jazeera* biased towards Israel and against Bahrain and banned it from covering events inside the country.(23) Saudi Arabian critics of their government who used *al-Jazeera* as an outlet for the peaceful expression of their views have paid a price. In September 2003, 'Abd al-'Aziz al-Tayyar, 44-year-old old former public relations director at Riyadh Chamber of Commerce, found his home surrounded by armed security men while he was taking part by phone in an *al-Jazeera* live news bulletin. The security forces forced their entry into his home and took him away, along with others who were with him. He was reportedly arrested for criticizing the government. He was released in March 2004 reportedly after making an undertaking not to critize the government.

The "war on terror" is also having effect on non governmental organizations (NGOs) in the region, including legitimate Islamic charities. The practice of mass arrests and detention without charge or trial against people for having travelled to Afghanistan, Pakistan, or having connections with people who had travelled to these countries, or simply for being perceived to hold "extremist Islamic views", has generated a sense of fear that giving to Islamic charities could expose donors to accusations of "terrorism". In Yemen, a source close to a number of charitable projects complained, "now people are scared to give to charitable projects for fear of being branded terrorists."

Many of the families of detainees held in the region and in Guantánamo Bay who were interviewed by AI believe that the prime reason their relatives are detained is because of their charitable work but have been deprived of the opportunity of due process to put this defense of their relatives to judicial scrutiny. Sami Muhi al-Din al-Haj's wife and his employers at *al-Jazeera* contend that Sami was detained in the course of doing his job. They believe that the case against him is untenable and that his arrest is based solely on his charity work in Afghanistan years earlier and a bureaucratic discrepancy in his passport, which the Sudanese government has clarified**.** "If my husband is among those detained, then I believe that they detain just anybody and take them to Guantánamo Bay," Sami's wife protested.

Khaled al-Odah's son Fawzi is a Guantánamo detainee. He explained his son's connection with Afghanistan and Pakistan, "At high school he began to collect money for the needy and his interests developed with time. Along with his friends, he began to adopt a yearly project whereby they helped build a school, a classroom, a mosque, or a well in poorer Islamic countries. There

was nothing peculiar about this activity; it was a general Kuwaiti phenomenon. They started small, by collecting money from family and neighbours and then began to have budgets and plans. When Fawzi was arrested he was carrying out their ninth project."

In addition to these families fears, some extrajudicial measures taken by governments after 11 September 2001 to cut off financial lifelines to "terrorists" appear to go beyond the limits of ensuring transparency of charitable financial transactions. In the aftermath of 11 September 2001, Yemeni security forces closed many voluntary Islamic schools and arrested hundreds of their students, including children as young as 12 years of age. In a similar fashion security forces indiscriminately rounded up honey traders, a big traditional trading business in Yemen, on suspicion that they had connection with Osama Bin Laden. Honey trading shops were closed for days or weeks and their owners were questioned by the security forces. Subsequently the honey traders were allowed to resume their trade. In other countries Islamic charities and suspected donors saw their assets confiscated or frozen. Badryia al-Awadhi, a Kuwaiti lawyer and member of the International Bar Association's Task Force for the Definition of International Terrorism, told AI of her concern that new measures undertaken "in the name of fighting terrorism and security pose unacceptable restrictions on Muslims' efforts to help themselves."

The fears felt and judgments expressed here are varied, but they are all a result of the sidelining of the rule of law and international human rights standards. Security forces are acting with impunity, and those affected are denied any recourse to justice.

## 5.0 THE SANA'A CONFERENCE: HUMAN BEINGS ARE BORN FREE AND EQUAL IN DIGNITY AND RIGHTS

At the invitation of AI and the National Organization for Defending Rights and Freedoms (HOOD), the "*Human Rights for All*" conference brought together over 150 participants from different countries. Most of the participants were lawyers, judges, legal experts, and government officials from the Middle East, Australia, the UK and the USA. Most participants had a formal concern with the detainees held beyond standard judicial supervision under various forms of "anti-terrorism" legislation in Guantánamo Bay and a number of locations within the Gulf and the Arabian Peninsula. In addition, family representatives of dozens of these detainees came to the Conference venue to file affidavits and to seek advice and assistance.

After the inauguration, the conference focused on two fundamental themes; the universality of human rights, and the legal and judicial obstacles facing lawyers and relatives in their struggle for justice for the detainees.

While aware of the fears and emotions generated by the gross human rights violations of the 11 September 2001 attacks in the US, participants unanimously rejected the undermining of the principle of universality of human rights in pursuit of the "war on terror". Derek Evans, former Deputy Secretary General of AI, told the conference, "Fear is the enemy of freedom, out of fear many people may initially be willing to surrender freedom – even fundamental rights – in exchange for what may be a false sense of security. Around the world, in many places, some state responses to anticipated threats have actually heightened *insecurity* – insecurity that stems from discriminatory legal practices and the use of prolonged incommunicado detention. Such measures put human rights at risk. They tear at the fabric of the international human rights

19

framework and threaten important achievements of the past 50 years."

The grave concerns of participants were succinctly captured by Dr Terry Waite who posed two critical questions. Referring to his own experience of being held in incommunicado detention and subjected to physical and psychological torture during the four years he spent as the hostage of an armed group in Lebanon, Dr. Waite asked, "How is it that we must now plead and negotiate with governments for respect for standards that have been recognized as basic and fundamental for more than fifty years – rights that should be taken as assumed and guaranteed?. What is the fundamental difference between what I experienced and suffered, and what is now being done to these detainees."

The discussions on the universality of human rights allowed participants to highlight how the terms and conditions under which detainees suspected of "terrorist" links are being held constitute a major human rights scandal of our time. It was also recognized that the situation in Guantánamo Bay represents a fundamental challenge to the rule of law, and is fomenting a human rights crisis with implications throughout the world. It was further recognized that the primary contextual factor determining the restriction of human rights protections available to such detainees being held in other countries is status of the relationship between the United States and the home governments.

With the assistance of a number of legal experts the Conference considered in detail the legal contexts of the detainees being held under "War on Terror" legislation or regulation in Guantánamo Bay, the Gulf and the Arabian Peninsula and other locations. Arbitrary and indefinite detention without charge, the absence of *habeas corpus* or other fundamental safeguards, denial of rights to independent counsel or even the pretence of the presumption of innocence. Persistent reports of torture were described as gross human rights violations.

The abandonment of established human rights principles and standards was described by the participants as both a shock and a grave concern. One expert observed, "It is apparent that the detention and prosecution of these detainees is not intended to serve the interests of truth and justice, but rather has been designed and established as a means of exacting vengeance and punishment." Another underlined the urgency of the challenge, "There can be no greater threat to all of us than when those in power summarily determine that fundamental human rights do not apply to some of us." One human rights expert commented with dismay, "the last thing we need is a bad example being set by the leader of the whole world", meaning the US.

Participants identified a number of emergent needs, including: initiatives to develop media and NGO pressure on both home governments and the United States authorities; mechanisms for lawyers and jurists in the region to share information and coordinate efforts; a system for ensuring access to and contact with the families of the detainees; a program to urge legislators and parliamentarians in the region to express concern for their own nationals being held in Guantánamo Bay and elsewhere, and to seek respect for international human rights standards in relation to their citizens. These needs were taken into consideration as the Conference participants explored means of continuing to work together, and are detailed in the final communiqué of the Conference, the *Sana'a Appeal*.(24)

Participants' grave concern about the human rights situation in the world today are reflected in the first paragraph of the *Sana'a Appeal*, issued at the end of the conference, which reads, "The continuing arbitrary and illegal detentions of thousands of persons in Guantánamo Bay – and a number of other places in the world – represents a fundamental challenge to the rule of law and constitutes a betrayal of fundamental human rights principles. This abuse generated by the often sweeping security measures adopted by many governments after the 11 September 2001 attacks in the USA which AI has unreservedly condemned, amounts to a human rights crisis that poses a threat to people of the world."

As human rights defenders, it is our most central belief that every woman, man, and child has inherent rights that belong to them as human beings. In fact, this is the notion that is enshrined in the Universal Declaration of Human Rights – that all human beings are born free and equal in dignity and rights. Basic rights do not come to us as an extension of citizenship, or as a gift of governments. They derive from our humanity, and it is our duty as members of civil society to claim them, to assert them, and to protect them both for ourselves and for others. In the *Sana'a Appeal*, participants called for the application of the rule of law and international human rights standards to all those targeted in the context of the "war on terror".

## 6.0 CONCLUSION

The pursuit of the "war on terror" unchecked by the rule of law and human rights standards has had deep and far-reaching consequences in the Gulf and the Arabian Peninsula. It has resulted in mass arbitrary arrest, incommunicado detention, indefinite detention without charge or trial and without access to the judiciary to challenge the legality of detention. It has also facilitated the implementation with total disregard for international standards of bilateral and multilateral security agreements resulting in the *refoulement* and forcible return of people to countries where they faced great risk of being subjected to serious human rights violations. There have also been cases of people whose fate and whereabouts are unknown and apparent extra-judicial killings.

The treatment of those targeted under "the war on terror" with total disregard for their rights and the rule of law has affected their families by association. Some relatives have been subjected to detention by security forces in order to force suspected members of their families to hand themselves in. It has punished their families. Family members find themselves in emotional turmoil, financial hardship and legal limbo.

The way the "war on terror" has been pursued represents a real threat to emerging human rights improvements in the Gulf and the Arabian Peninsula. In recent years governments in the region began to show positive response to demands for human rights improvements and a departure, albeit slow, away from decades plagued by large scale, systematic and gross human rights violations. The "war on terror" has revived the old practices. Governments in the region are using it as a pretext for restricting freedom of expression and political dissent in the Gulf and the Arabian Peninsula, generating fear among journalists, government critics and generally people known or perceived to have militant religious views. The forms of retaliation against such people include arrest and detention, forcible retirement from their jobs or denying them employment with no real opportunity of challenging the security forces decisions in this regard.

21

As this report shows, the human sufferings endured by those targeted in the context of the "war on terror" and by association, their families are some of the very consequences which the spirit of international human rights standards is intended to prevent. While AI calls on governments to exercise the right and responsibility to bring to justice people suspected of recognisably criminal offences, it opposes the exercise of such right and responsibility outside the rule of law and international human rights standards.

In order to redress and avoid the sufferings detailed in this report, the pursuit of the "war on terror" must be governed by the rule of law and international human rights standards.

- The "war on terror" should not be used to quash the right to freedom of expression, association and assembly enshrined in Articles 19, 21 and 22 (1) and (2) of the International Covenant on Civil and Political Rights (ICCPR).
  - Article 19 (2) of the ICCPR states that "Everyone shall have the right to freedom of expression; this right shall include freedom to seek, receive and impart information and ideas of all kinds, regardless of frontiers, either orally, in writing or in print, in the form of art, or through any other media of his choice."
  Article 19 (3) of the ICCPR states that "The exercise of the rights provided for in paragraph 2 of this article carries with it special duties and responsibilities. It may therefore be subject to certain restrictions, but these shall only be such as are provided by law and are necessary:
  (a) For respect of the rights or reputations of others;
  (b) For the protection of national security or of public order (*ordre public*), or of public health or morals."
  Article 21 of the ICCPR states that "The right of peaceful assembly shall be recognized."
  Article 22 (1) of the ICCPR states that "(Everyone shall have the right to freedom of association with others, including the right to form and join trade unions for the protection of his interests." Restrictions on the rights of freedom of association and assembly are allowed only under specific conditions as required by Article 22 (2) which states that "No restrictions may be placed on the exercise of this right other than those which are prescribed by law and which are necessary in a democratic society in the interests of national security or public safety, public order (*ordre public*), the protection of public health or morals or the protection of the rights and freedoms of others."
  - The "war on terror" should not be used to detain people arbitrarily, or deny them communication with the outside world, in accordance with Article 9 of the ICCPR which provides for several guarantees against arbitrary detention, Principle 19 of the Body of Principles for the Protection of All persons Under Any Form of Detention or Imprisonment and Rule 92 of the Standard Minimum Rules For the Treatment of Prisoners.
  Article 9 (1) of the ICCPR states that "Everyone has the right to liberty and security of person. No one shall be subjected to arbitrary arrest or detention. No one shall be deprived of his liberty except on such grounds and in accordance with such procedure as are established by law."
  Article 9 (3) of the ICCPR states that "Anyone arrested or detained on a criminal

charge shall be brought promptly before a judge or other officer authorized by law to exercise judicial power and shall be entitled to trial within a reasonable time or to release.

Article 9 (4) of the ICCPR states that "Anyone who is deprived of his liberty by arrest or detention shall be entitled to take proceedings before a court, in order that court may decide without delay on the lawfulness of his detention and order his release if the detention is not lawful."

Principle 19 of the Body of Principles for the Protection of All persons Under Any Form of Detention or Imprisonment states that "A detained or imprisoned person shall have the right to be visited by and to correspond with, in particular, members of his family and shall be given adequate opportunity to communicate with the outside world, subject to reasonable conditions and restrictions as specified by law or lawful regulations."

Rule 92 of the Standard Minimum Rules For the Treatment of Prisoners guarantees that "An untried prisoner shall be allowed to inform immediately his family of his detention and shall be given all reasonable facilities for communicating with his family and friends, and for receiving visits from them, subject only to restrictions and supervision as are necessary in the interests of the administration of justice and of the security and good order of the institution."

- The "war on terror" cannot be used as justification for the use of torture. Torture is strictly prohibited in accordance with Articles 7 and 10 of the ICCPR and Article 15 of the Convention against Torture Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT).
  Article 7 of the ICCPR states that "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment."
  Article 10 (1) of the ICCPR states that "All persons deprived of their liberty shall be treated with humanity and with respect for the inherent dignity of the human person."
  Article 15 of CAT states that "…any statement which is established to have been made as a result of torture shall not be invoked as evidence in any proceedings, except against a person accused of torture as evidence that the statement was made."

- The "war on terror" must not be used to deny those targeted their right to seek justice as required by Article 14 of the ICCPR.
  Article 14 (1) of the ICCPR states that "All persons shall be equal before the courts and tribunals. In the determination of any criminal charge against him, or of his rights and obligations in a suit at law, everyone shall be entitled to a fair and public hearing by a competent, independent and impartial tribunal established by law. The press and the public may be excluded from all or part of a trial for reasons of morals, public order (ordre public) or national security in a democratic society, or when the interest of the private lives of the parties so requires, or to the extent strictly necessary in the opinion of the court in special circumstances where publicity would prejudice the interests of justice; but any judgement rendered in a criminal case or in a suit at law shall be made public except where the interest of juvenile persons otherwise requires or the proceedings concern matrimonial disputes or the

guardianship of children."
Article 14 (2) of the ICCPR states that "Everyone charged with a criminal offence shall have the right to be presumed innocent until proved guilty according to law."

- The "war on terror" must not be used to forcibly return people to countries where they would face serious human rights violations such as torture or execution, and ensure the rights of refugees and asylum seekers in accordance with the 1951 Refugee Convention and Article 3 of CAT.
Article 3 (1) of CAT states that "No State Party shall expel, return ("*refouler*") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture."

- The "war on terror" must not be used to cause the "disappearance" or extra-judicial killing of suspects as stipulated in Article 6 of the ICCPR and Principle 1 of the United Nations Principles on the Effective Prevention and Investigation of Extra-legal, Arbitrary and Summary Executions.
Article 6 (1) of the ICCPR states that "1. Every human being has the inherent right to life. This right shall be protected by law. No one shall be arbitrarily deprived of his life."
Principle 1 of the United Nations Principles on the Effective Prevention and Investigation of Extra-legal, Arbitrary and Summary Executions states that "Governments shall prohibit by law all extra-legal, arbitrary and summary executions and shall ensure that any such executions are recognized as offences under their criminal laws, and are punishable by appropriate penalties which take into account the seriousness of such offences. Exceptional circumstances including a state of war or threat of war, internal political instability or any other public emergency may not be invoked as a justification of such executions."

- Finally, the "war on terror" must not be used to arrest or detain children as enshrined in the Convention on the Rights of the Child (CRC) particularly Article 37.
Article 37 (b) of the CRC states that "No child shall be deprived of his or her liberty unlawfully or arbitrarily. The arrest, detention or imprisonment of a child shall be in conformity with the law and shall be used only as a measure of last resort and for the shortest appropriate period of time."
Article 37 (c) of the CRC states that "Every child deprived of liberty shall be treated with humanity and respect for the inherent dignity of the human person, and in a manner which takes into account the needs of persons of his or her age. In particular, every child deprived of liberty shall be separated from adults unless it is considered in the child's best interest not to do so and shall have the right to maintain contact with his or her family through correspondence and visits, save in exceptional circumstances."

## 7.0 RECOMMENDATIONS

To redress the violations detailed in this report and ensure respect of human rights for all, AI urgently appeals:

**To the United States Government and Governments in the Gulf and the Arabian Peninsula:**

- Release anyone detained solely for their non-violent expression and exercise of their belief or ethnic origin;
- End the legal limbo of all detainees, including those held in undisclosed locations and grant them full access to lawyers, doctors, families and immediate access to the International Committee of the Red Cross;
- Ensure that all those held are charged and given fair trials or released;
- Ensure that the detainees are treated humanely and not subjected to torture;
- Investigate all allegations of torture and bring to justice anyone who is reasonably believed to be responsible;
- Halt the forcible return of foreign nationals to countries where they would face serious human rights violations;
- Ensure strict compliance with human rights standards in any security cooperation between states and in all security training programs;
- Provide adequate support and assistance to families of detainees including the granting of legal aid;
- Grant AI and other human rights organizations access to detainees and officials in Guantánamo Bay and in the Gulf and the Arabian Peninsula.

**To the Arab League to:**

- Act to amend the 1998 Arab Convention for the Suppression of Terrorism to include provisions for human rights safeguards, including in relation to extradition processes.

**To the International Community to:**

- AI calls on the international community to exert pressure on the US, the Gulf and the Arabian Peninsular governments to apply the rule of law and international human rights standards to all detainees held in connection with the "war on terror".

********

(1) "Uthman's shirt" is a commonly used Arabic phrase. It refers to early Islamic history when, in the name of pursuing justice after the murder of the third Caliph, Uthman Ibn 'Affan (656AD), his cousin Muawyia created a political order which repressed dissent.

(2) For further information see AI Urgent Action - Legal concern / Death penalty / Health concern - Moazzam Begg, David Hicks, Salim Ahmed Hamdan, Ali Hamza Ahmed Sulayman al-Bahlul and Ibrahim Ahmed Mahmoud al-Qosi - (AI Index: AMR 51/066/2004), 22 April 2004, http://web.amnesty.org/library/Index/ENGAMR510662004.

(3) Commander, US Southern Command General James T Hill, Department of Defense News Transcript, 3 June 2004.

(4) Interview with the Sunday Times (UK Newspaper), 21 March 2002.

(5) For further information see AI report, "United States of America: Memorandum to the US Government on the rights of people in US custody in Afghanistan and Guantánamo Bay", AI Index: AMR 51/053/2002, 15 April 2002, http://web.amnesty.org/library/Index/ENGAMR510532002.

(6) The wife of one of the two Australians held in Guantánamo has said, "It is hard for me to think that he has not been abused in there. When I see what they are doing to the Iraqi prisoners - God knows what sort of treatment they are receiving in Guantánamo Bay." The Age (Melbourne Newspaper), 16 May 2004.

(7) For further information see AI report, "United States of America: Memorandum to the US Government on the rights of people in US custody in Afghanistan and Guantánamo Bay", (AI Index: AMR 51/053/2002), 15 April 2002, http://web.amnesty.org/library/Index/ENGAMR510532002.

(8) For further information see AI document, "An open letter to President George W. Bush on the question of torture and cruel, inhuman or degrading treatment", (AI Index: AMR 51/078/2004), 7 May 2004, http://web.amnesty.org/library/Index/ENGAMR510782004 .

(9) Bahrain Tribune, (Bahraini Newspaper) 20 May 2004

(10) The Bahraini parliamentary delegation visited the US Congress in 2003.

(11) Remarks by presiding German Judge Klaus Tolksdorf after quashing the conviction of Mounir al-Motassadek for his alleged role in the 11 September attacks in the USA.

(12) For further information see AI Public Statement, "Saudi Arabia: Amnesty International condemns the killing of civilians by armed groups in al-Khober", (AI Index: MDE 23/006/2004), 4 June 2004, http://web.amnesty.org/library/Index/ENGMDE230062004?open&of=ENG-SAU.

(13) For further information see AI report, "Saudi Arabia: A Justice System Without Justice", (AI Index: MDE 23/02/2000), May 2000, http://web.amnesty.org/library/Index/ENGMDE230022000?open&of=ENG-SAU .

(14) For further information see AI report, "Saudi Arabia: A Fertile Ground for Torture with Impunity", (AI Index: MDE 23/004/2002), May 2002, http://web.amnesty.org/library/Index/ENGMDE230042002?open&of=ENG-SAU.

(15) For further information see AI press Release, "Yemen/USA: government must not sanction extra-judicial executions" (AI Index: AMR51/168/2002), 8 November 2002, http://web.amnesty.org/library/Index/ENGAMR511682002?open&of=ENG-YEM and AI report, "Yemen: The Rule of Law Sidelined in the Name of Security", (AI Index: MDE 31/006/2003), September 2003

http://web.amnesty.org/library/Index/ENGMDE310062003?open&of=ENG-YEM.

(16) al-Jazirah (Saudi Arabian Newspaper), 23 February 2004.

(17) For further information see AI report, "The Arab Convention for the Suppression of Terrorism a Serious Threat to Human Rights", (AI Index: IOR 51/001/2002).

(18) For further information see AI Urgent Action – Torture and Ill-treatment – Dr Matrouk al-Falih, Dr Abdullah al-Hamid, Ali al-Deminy, Abdel Rahman al-Lahem, Muhammad Sa'id Tayyab, Dr Tawfiq al-Qussayyir, Suleyman al-Rashudi and at least four others – (AI Index: MDE 23/005/2004), 30 April 2004.

(19) For further information see al-Shura, (Yemeni Weekly Newspaper) 18/1/2004, Issue 468, pp. 1,2.

(20) According to Islamic teachings, a Muslim must be in a state of ablution to perform his daily prayers.

(21) For further information see AI report, "Yemen: The Rule of Law Sidelined in the Name of Security", (AI Index: MDE 31/006/2003), September 2003, http://web.amnesty.org/library/Index/ENGMDE310062003?open&of=ENG-YEM.

(22) See for example report by Christian Parenti, "al Jazeera Goes to Jail", The Nation (US based Magazine), posted 11 March 2004.

(23) BBC Online, 10 May 2002.

(24) For further information see AI Open Letter, "Sana'a Appeal", (AI INDEX: POL 30/018/2004), 13 April 2004,