# Exhibit E



## Saudi Arabia

Country Reports on Human Rights Practices  - 2004
Released by the Bureau of Democracy, Human Rights, and Labor
February 28, 2005

Saudi Arabia is a monarchy without elected representative institutions or political parties. King Fahd bin Abd Al-Aziz Al Saud suffered a stroke in 1995, and Crown Prince Abdullah has been the de facto ruler since that time. As custodian of Islam's two holiest sites in Mecca and Medina, the Government bases its legitimacy on governance according to Islamic law (Shari'a). The Basic Law sets out the system of government, rights of citizens, powers, and duties of the State, and provides that the Koran and the Traditions (Sunna) of the Prophet Muhammad are the country's Constitution. Neither the Government nor Saudi society, in general, accepts the concept of separation of religion and state. The King serves as Prime Minister and appoints the crown prince. The Crown Prince is First Deputy Prime Minister and heir apparent. The appointed Majlis al-Shura debates, rejects, and amends government-proposed legislation, questions some government officials, and has the power to initiate legislation. The Basic Law provides for an independent judiciary; however, some members of the royal family are not required to appear before the courts, and they and their associates have influenced judges.

The Government maintains effective control of the various security forces. Police and border forces under the Ministry of Interior (MOI) are responsible for internal security. The MOI also controls the Mabahith, or internal security force, and its own special forces. The Committee to Promote Virtue and Prevent Vice (Mutawwa'in), or religious police, is a semiautonomous agency that enforces adherence to strictly conservative Islamic norms by monitoring public behavior. The Crown Prince controls the National Guard. The Second Deputy Prime Minister and Minister of Defense and Aviation is responsible for all of the Ministry of Defense's armed forces. The Minister of Interior exercised control over the Kingdom's internal security forces. Members of the security forces committed human rights abuses.

The population was approximately 26.7 million, of which more than 7 million were foreign citizens. Oil revenue was the basis of the transformation of the country from a Bedouin, nomadic, and rural society to a predominantly settled and urban one. Oil and gas revenues accounted for approximately 40 percent of the gross domestic product (GDP) and 79 percent of government income. Agriculture accounted for approximately 5 percent of GDP. Government spending accounted for 32 percent of GDP. Approximately 40 percent of the economy was nominally private. The Government continued to implement its Saudiization policy, which requires employers to increase the number of citizens in the work force.

The Government's human rights record remained poor overall with continuing serious problems, despite some progress. Citizens did not have the right to change their government. Security forces continued to abuse detainees and prisoners, arbitrarily arrest, and hold persons in incommunicado detention. There were cases in which Mutawwa'in continued to intimidate, abuse, and detain citizens and foreigners. Most trials were closed, and defendants usually appeared before judges without legal counsel. Security forces arrested and detained reformers, some of whom continued at year's end to seek an open trial. The Government reportedly infringed on individuals' privacy rights. The Government continued to restrict freedoms of speech and press, assembly, association, religion, and movement. There was widespread public perception that corruption by some members of the royal family and in the executive branch of the Government was a serious problem. There was little government transparency, especially notable in official budgets, and with no laws providing the right to access government information. The Government continued to discriminate against women, ethnic and religious minorities and to impose strict limitations on worker rights.

On November 23, the Government began registering non-military, male citizens and candidates for the country's first nationwide municipal elections. Municipal elections for 4-year terms to half of the seats on 178 local councils are slated to take place between February and April 2005. Women were not permitted to vote or run for office. In June, the King Abd Al-Aziz Center for National Dialogue held its third conference in

a series intended "to build and enhance a culture of dialogue in Saudi society." The government-sponsored conference focused on the issue of "women's rights and obligations and the educational correlation." The Fourth National Dialogue in December focused on "Youth Issues: Realities and Aspirations" and recommended developing the curricula to cultivate among Saudi pupils "the values of moderation, the middle path, and respect for others-—and to make them accustomed to conducting discussion and debate."

The newly formed government-patronized National Society for Human Rights (NSHR), the first human rights group which the Government has formally permitted to operate in the country, began to address some human rights violations, such as prison conditions. In October, the Government amended the naturalization law to permit some long-term residents to apply for citizenship. This step was particularly significant for the thousands of Bidoons (descendants of stateless nomads) residing in the country.

**RESPECT FOR HUMAN RIGHTS**

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary or Unlawful Deprivation of Life

There were no reports of political killings; however, the Government executed persons for criminal offenses after closed trials, making it impossible to assess whether legal protections were applied (see Section 1.e.). The country's highest court, the Supreme Judicial Council, is responsible for reviewing cases involving stoning, amputation, or death, and sentences can only be enforced pursuant to a Royal Decree issued by the King.

During the year, terrorists killed more than 30 foreigners and citizens, including 5 employees of a foreign consulate in Jeddah. Their attacks consisted of kidnappings, targeted shootings, bombings, and beheadings.

b. Disappearance

There were no reports of politically motivated disappearances.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The Criminal Procedure section of the Basic law prohibits torture and Shari'a (Islamic law) prohibits any judge from accepting a confession obtained under duress; however, authorities reportedly at times abused detainees, both citizens and foreigners. Ministry of Interior officials were responsible for most incidents of abuse of prisoners, including beatings, whippings, and sleep deprivation. In addition, there were allegations of beatings with sticks and suspension from bars by handcuffs. There were allegations that these practices were used to force confessions from prisoners.

Canadian and British prisoners released in 2003 reported that they had been tortured during their detention; however, the Government denied these claims.

Maintaining its reservation to Article 20 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, the Government does not recognize the jurisdiction of the Committee Against Torture to investigate allegations of systematic torture.

During the year, the Mutawwa'in harassed, abused, and detained citizens and foreigners of both sexes. They also brought citizens to police stations for detention. These incidents were most common in the central region, including the capital, Riyadh, and less frequent in the eastern and western regions of the country. Mutawwa'in abuses continued during the year, despite an initial decrease following the May 2003 terrorist attacks.

The Government punished criminals according to its interpretation of Shari'a. Punishments included imprisonment, flogging, amputation, and execution by beheading. At year's end, the press reported approximately 30 executions, including one woman. Executions were for killings, narcotics-related offenses, rape, and armed robbery. The authorities punished repeated thievery and other repeated offenses by amputation of the right hand and left foot. Persons convicted of less serious offenses, such as alcohol-related offenses or being alone in the company of an unrelated person of the opposite sex, sometimes were punished by caning. The Government also punished convicted persons by flogging. According to press reports, lashes were generally administered with a thin reed by a man who must hold a book under his arm to prevent him from lifting the arm too high. The strokes, delivered through a thin shirt, are not supposed to leave permanent damage, but to leave painful welts that bleed and bruise.

At year's end, there were no reports that the flogging sentences imposed on the demonstrators arrested in October 2003 had been commuted.

Prison and jail conditions varied. Prisons reportedly generally met internationally accepted standards and provided air-conditioned cells, good nutrition, regular exercise, and careful patrolling by prison guards. The Government permitted the NSHR to visit some prisons or jails during the year. In December, the NSHR released a report on conditions in jails, detention centers, and police station detention facilities. According to the press, they found that "in general conditions were good." However, there was variation. The report cited below-acceptable standards in hygiene, food, medical, and social services; prolonged detention of expatriates because their sponsors refused to provide travel tickets; and prolonged detention of prisoners in poor health. The report also noted that many jails remained overcrowded because prisoners remained in jail long after they had completed their sentences. Authorities occasionally allowed family members access to detainees, but in some cases only after a significant period of time. The authorities restricted access of foreign visitors to the prisons, 80 percent of whose inmates were non-Saudis, according to Human Rights Watch. The Government maintained separate detention facilities for men, women, and juveniles.

There are several Committees for Collection of Donations for Impoverished Prisoners throughout the country. The Committees raised funds in order to pay for fines resulting from traffic accidents and civil cases since prisoners are required to remain in custody until the fines are paid, regardless of length of sentence.

d. Arbitrary Arrest, Detention, or Exile

The law prohibits arbitrary arrest and detention and limits the period of arrest to 5 days without charges being filed; however, in practice, persons were held weeks or months and sometimes longer, and the law gives the Minister of Interior broad powers to detain persons indefinitely.

The authorities at times arrested and detained persons without following explicit legal guidelines. The Mutawwa'in intimidated and brought to police stations persons whom they accused of committing "crimes of vice" based on their own religious interpretations.

The regulations also provide for bail for less serious crimes, although authorities at times released detainees on the recognizance of a patron or sponsoring employer without the payment of bail. If they were not released, authorities typically detained accused persons for an average of 2 months before sending the case to trial or, in the case of some foreigners, summarily deporting them. There were no established procedures providing detainees the right to inform their family of their arrest.

On April 19, the Government re-arrested Islamist dissident Shaykh Sa'eed bin Za'er for remarks made on Al-Jazeera about terrorism in the country. Za'er had been released in March 2003 after more than 8 years in prison for publicly condemning a fatwa permitting peace with Israel. At year's end, he remained in detention. A dual Jordanian-American citizen, Ahmed Abu Ali, has been held in detention since his arrest in June 2003.

The Government continued its long-standing tradition of releasing prisoners in honor of Ramadan.

The Mutawwa'in have the authority to detain persons for no more than 24 hours for violations of the strict standards of proper dress and behavior; however, at times, they exceeded this limit before delivering detainees to the police (see Section 1.f.). Procedures required a police officer to accompany the Mutawwa'in at the time of an arrest. Mutawwa'in generally complied with this requirement, however, there were cases during the year in which Mutawwa'in detained persons without the presence of a police officer. During the year, in the more conservative Riyadh district, reports continued of Mutawwa'in accosting, abusing, arresting, and detaining persons alleged to have violated dress and behavior standards

The Mutawwa'in detained young men for offenses that included eating in restaurants with young women, making lewd remarks to women in the shopping malls, or walking in groups through family-only sections of shopping centers. Mutawwa'in detained women of many nationalities for actions such as riding in a taxi with a man who was not their relative, appearing with their heads uncovered in shopping malls, and eating in restaurants with males who were not their relatives. Many such prisoners were held for days, sometimes weeks, without officials notifying their families or, in the case of foreigners, their embassies.

There were cases in which the Government arrested and detained Christians, at times for holding services and at times apparently arbitrarily (see Section 2.c.).

Political detainees who are arrested by the General Directorate of Investigation (GDI), the Ministry of Interior's security service (Mabahith), have been held incommunicado in special prisons during the initial phase of an investigation, which may last weeks or months under the Ministry's broad legal authority. The GDI restricted access of families or lawyers to detainees.

The authorities may detain without charge persons who publicly criticize the Government, or may charge them with attempting to destabilize the Government (see Sections 2.a. and 3). Following the demonstrations in December in this year and in October 2003 in a number of cities, authorities arrested and detained political protesters for weeks prior to charging them (see Sections 2.a. and 3).

The Government continued to commit abuses against members of the Shi'a Muslim minority. Government security forces reportedly arrested Shi'a based on scant suspicion, held them in custody for lengthy periods, and then released them without explanation.

Citizens can report abuses by security forces at any police station; however, there is no data on how complaints were handled.

In March, the Government arrested 13 leading advocates for democratic reform in the Kingdom on charges that they were involved in activities "that do not serve the unity of the country or the cohesion of a society based on Islamic law." Most were released after reportedly signing statements promising not to speak publicly or to agitate for reform; however, three remained imprisoned at year's end (see Sections 1.e. and 2.d.).

e. Denial of Fair Public Trial

The law provides for an independent judiciary, and the Government generally respected this provision; however, some members of the royal family generally were not required to appear before the courts, and their associates have influenced judges. The Supreme Judicial Council, whose members are appointed by the King, appoints, transfers, and removes judges. The Ministry of Justice disciplines judges.

The law allows for a public trial; however in practice, many trials were not public.

The legal system is based on Shari'a. Shari'a courts exercise jurisdiction over common criminal cases and civil suits regarding marriage, divorce, child custody, and inheritance. Such jurisdiction extends to non-Muslims for crimes committed in the country. Cases involving relatively small penalties were tried in Shari'a summary courts. More serious crimes are adjudicated in Shari'a courts of common pleas. Appeals from Shari'a courts are made to the courts of appeal.

Other civil proceedings, including those involving claims against the Government and enforcement of foreign judgments, were held before specialized administrative tribunals, such as the Commission for the Settlement of Labor Disputes and the Board of Grievances.

The Government permitted Shi'a Muslims to use their own legal tradition to adjudicate cases involving domestic issues, inheritance, and Islamic endowments. However, there were only two judges, which was insufficient to serve the large Shi'a population in the Eastern Province. There was no comparable right for non-Muslims or foreigners, whose cases were handled in regular Shari'a courts.

The military justice system has jurisdiction over uniformed personnel and civil servants who are charged with violations of military regulations. The Minister of Defense and Aviation and the King review the decisions of courts-martial.

The Supreme Judicial Council may not reverse decisions made by courts of appeal. However, the Council may review lower court decisions and refer them back to the lower court for reconsideration

The "Ulema," the Council of Senior Religious Scholars is an autonomous body of 20 senior religious jurists, including the Minister of Justice. It interprets Shari'a establishing the legal principles to guide lower-court judges. The Criminal Procedure Law provides persons under investigation the right to a lawyer and permits lawyers to present arguments in criminal courts. The Law also provides the right to inform convicts of their right to appeal rulings.

A woman's testimony does not carry the same weight as that of a man. In a Shari'a court, the testimony of one man equals that of two women. Under the Hanbali interpretation of Shari'a law followed in the Kingdom, judges may discount the testimony of persons who are not practicing Muslims or who do not adhere to the correct doctrine. Legal sources reported that testimony by Shi'a is often ignored in courts of

law or is deemed to have less weight than testimony by Sunnis.

Female parties to court proceedings such as divorce and family law cases generally must deputize male relatives to speak on their behalf. In the absence of two witnesses, or four witnesses in the case of adultery, confessions before a judge almost always were required for criminal conviction--a situation that has led prosecuting authorities to coerce confessions from suspects by threats and abuse (see Section 1.c.).

Laws and regulations state that defendants should be treated equally; however, sentencing was not uniform and crimes against Muslims received harsher penalties than those against non-Muslims. In the case of wrongful death, the amount of indemnity or "blood money" (compensation) awarded to relatives varied with the nationality, religion, age, and sex of the victim. A sentence may be changed at any stage of review, except for punishments stipulated by the Koran.

Islamic law considers Hindus to be polytheists; the law was used as a justification for greater discrimination in calculating accidental death or injury compensation. According to the country's Hanbali interpretation of Shari'a, once fault is determined by a court, a Muslim male receives 100 percent of the amount of compensation determined, a male Jew or Christian received 50 percent, and all others (including Hindus) received 1/16 of the amount a male Muslim receives. Women receive 50 percent of what males receive in each of these categories.

Provincial governors (almost all of whom are members of the royal family) have the authority to exercise leniency and reduce a judge's sentence. In general, some members of the royal family and other powerful families were not subject to the same rule of law as ordinary citizens.

The King and his advisors reviewed cases involving capital punishment. The King has the authority to commute death sentences and grant pardons, except for capital crimes committed against individuals. In such cases, he may request the victim's next of kin to pardon the killer--usually in return for compensation from the family or the King.

The Government did not provide information regarding political prisoners or respond to inquiries about them. The Government conducted closed trials for persons who may have been political prisoners and in other cases has detained persons incommunicado for long periods while under investigation.

In March, the Government arrested 13 individuals who had been leading advocates for democratic reform in the Kingdom. Most were released after reportedly signing statements promising not to agitate for reform; however, three who refused to sign such statements were imprisoned and later put on trial. The Government formally charged the individuals, most notably with charges of organizing petitions calling for Constitutional reform and speaking to journalists. The courts held several hearings concerning the cases, which journalists and other observers were permitted to attend, and the press reported on these proceedings during the year. Despite these hearings, at year's end, it was still unclear whether the court will accede to the defendants' demands that the trial be public (see Sections 1.d. and 2.d.).

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The Basic Law guarantees the inviolability of homes and the privacy of correspondence. The Criminal Procedure Law requires authorities to obtain a warrant prior to searching a residence, or a court order prior to perusing personal correspondence or documents. The Government generally respected this inviolability; however, there were cases in which the Government infringed on these rights. Royal decrees include provisions calling for the Government to defend the home from unlawful intrusions, while laws and regulations prohibit officials from intercepting mail and electronic communications except when necessary during criminal investigations.

The police generally must demonstrate reasonable cause and obtain permission from the provincial governor before searching a private home.

Customs officials routinely opened mail and shipments to search for contraband, including material deemed pornographic and non-Sunni Muslim religious material. Customs officials confiscated or censored materials considered offensive, including Christian Bibles and religious videotapes (see Section 2.c.). The authorities also opened mail and used informants and wiretaps in internal security and criminal matters. Security forces used wiretaps against foreigners suspected of alcohol-related offenses. Informants and an informal system of ward bosses in some districts reported "seditious ideas," anti-government activity, or behavior contrary to Islam in their neighborhoods to the Ministry of the Interior.

The Government enforced most social and Islamic religious norms, the Government's interpretations of which are matters of law (see Section 5). Women may not marry noncitizens without government permission; men must obtain government permission to marry noncitizen women outside the six states of the Gulf Cooperation Council. In accordance with Shari'a, women are prohibited from marrying non-Muslims; men may marry Christians and Jews, as well as Muslims. Tradition and culture, not law, restrict marriages between Sunni and Shi'a citizens, and the Government does not refuse marriage licenses between Sunni and Shi'a couples.

The Government at times imposed restrictions on the right of certain Government employees to marry foreigners. The Government subjects top civil servants and security officials to extensive questioning when applying to marry foreigners. The Government tends to be more lenient in approving marriages to foreigners by the elderly and disabled. The marital restrictions also applied to citizens studying overseas on government scholarships. Violators risked disciplinary action; however, this policy was rarely violated and there were no reports of sanctions being imposed.

Mutawwa'in practices and incidents of abuse varied widely in different regions of the country, but they were most numerous in the central Nejd region. In certain areas, both the Mutawwa'in and religious vigilantes acting on their own harassed, abused, arrested, and detained citizens and foreigners (see Section 1.d.).

Mutawwa'in enforcement of strict standards of social behavior included closing commercial establishments during the five daily prayer observances, insisting upon compliance with strict norms of public dress, and dispersing gatherings of women in public places designated for men, as well as preventing men from entering public places designated for families. Mutawwa'in frequently reproached citizen and foreign women for failure to observe strict dress codes and arrested men and women found together who were not married or closely related.

Incidents with Mutawwa'in increased during Ramadan because many felt they had added license to assert their authority during the holy month.

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The Basic Law states that the media's role is to educate the masses and boost national unity and that it can be banned if it gives rise to mischief and discord, compromises the security of the State and its public image, or offends man's dignity and rights. The Government continued to restrict freedom of speech and press, although there was regular discussion of social, economic, and political issues previously considered taboo.

In March, journalist Faris Bin Hozam al-Harbi was banned from writing or working for any newspaper. On November 6, the lead attorney for the arrested reformers, Abdul Rahman Al-Lahem, was arrested. Al-Lahem had signed an undertaking not to speak to the press about the case, but continued to give interviews, telling one journalist that he did not accept the Government's attempt to silence him.

No charges were entered against Al-Lahem, and he remained imprisoned and without access to his family or lawyers at year's end. In December, journalists for national newspapers the Saudi Gazette and Al-Madina were arrested and later released at the trial of the reformers arrested in March.

In 2003, the Government sanctioned several journalists for articles and commentaries critical of the religious authorities and conservative Muslim theology, particularly after the May 2003 terrorist attacks.

Newspapers reported on previously taboo subjects including political, economic, and educational reform, women's rights, rights of foreigners, corruption, religion, and domestic problems such as abuse of women, servants, and children (see Section 5). Newspapers carried stories about elections in neighboring Gulf countries and reported on reform discussions within the country, including extensive coverage of the upcoming municipal elections and voter and candidate registration.

The print media were censored and privately owned, but publicly subsidized, and some were financially backed by or had close ties to members of the royal family. Journalists also practiced self-censorship, refraining from direct criticism of government officials. A media policy statement and a national security law prohibit the dissemination of criticism of the royal family and the Government. The media policy statement urged journalists to uphold Islam, oppose atheism, promote Arab interests, and preserve cultural heritage. The Ministry of Information appoints, and may remove, all editors-in-chief. The Government also provided

guidelines to newspapers regarding controversial issues. The government-owned Saudi Press Agency (SPA) expressed official government views.

In February 2003, the Government granted a charter to a professional journalists' association. The association began registering members, opening membership to all journalists in the country or abroad who have worked in the profession for 3 years or longer. Both men and women were members, and noncitizen journalists working in the country were eligible to join as non-voting members. On June 7, the association elected its first nine-member board of directors, which included two female journalists.

The authorities continued to ban government employees from criticizing the Government. On September 13, the Council of Ministers announced that the Government planned to enforce existing laws based on Article 12 of the Basic Law that provides the State with the authority to "prevent anything that may lead to disunity, sedition, and separation." Accordingly, all public employees were enjoined from "participating, directly or indirectly, in the preparation of any document, speech or petition, engaging in dialogue with local and foreign media, or participating in any meetings intended to oppose the State's policies."

Newspapers routinely investigated and published stories on crime and terrorism without prior government authorization. Two London-based Arabic dailies, Al-Sharq Al-Awsat and Al-Hayat, were owned by members of the royal family and were distributed widely and read in the country. Both newspapers practiced some degree of self-censorship to comply with government guidelines on sensitive issues.

The Government owned and operated most domestic television and radio companies. Government censors removed any reference to politics, religions other than Islam, pork or pigs, alcohol, and sex from foreign programs and songs. There were several million satellite-receiving dishes in the country, which provided citizens with foreign television programming.

During the year, the Majlis al-Shura continued partial, delayed television coverage of its proceedings and allowed journalists to attend sessions. There was frequent coverage in the press of Majlis proceedings and votes. The Ministry of Foreign Affairs held regular press conferences for journalists. During the year, the press carried timely and accurate coverage of terrorist attacks and the subsequent government campaign against terrorism in the country.

Access by citizens to outside sources of information, such as Arabic and Western satellite television channels and the Internet, was widespread.

On January 12, the Government introduced a new locally based satellite news channel, "Al-Akhbaria," which included six female newscasters on the staff.

The Government permitted a large number of international media professionals and foreign journalists and photographers, both male and female, to travel freely and to conduct interviews.

The Government banned all books, magazines, and other materials that it considered sexual or pornographic in nature. The Ministry of Information compiled and updated a list of publications that were prohibited from being sold in the country. The Government censored most forms of public artistic expression and prohibited cinemas and public musical or theatrical performances, except those that were considered folkloric.

Access to the Internet was available through local government-monitored servers. There were as many as one million Internet subscribers. Some citizens attempted to circumvent this control by accessing the Internet through servers in other countries. The Government attempted to block Web sites that it deemed sexual, pornographic, politically offensive, or "un-Islamic;" however, many citizens were able to circumvent these restrictions.

A 2003 ban was continued, forbidding a university professor from teaching and traveling. The ban was imposed because he had criticized the Government's discriminatory policies against the Shi'a.

The Government restricted academic freedom. The Government prohibited the study of evolution, Freud, Marx, Western music, and Western philosophy. Professors reportedly believed that informers monitored their classroom comments and reported them to government and religious authorities.

b. Freedom of Peaceful Assembly and Association

The Basic Law does not address freedom of association or assembly, and the Government strictly limited it in practice and prohibited public demonstrations as a means of political expression.

On December 16, police arrested 21 persons for taking part in an anti-government protest in Jeddah. The protest was called by Saad al-Faqih, a London-based Saudi, who was designated by the United States as a supporter of international terrorism. At year's end, the detainees were awaiting trial (see Sections 1.d. and 3).

In October 2003, several hundred persons demonstrated in Riyadh and other cities in a protest organized by the London-based Movement for Islamic Reform (MIRA). Police broke up the protest and arrested most of the demonstrators (see Sections 1.d. and 3). During the February Shi'a Ashura observance in Qatif, the Government permitted worshippers to gather over the course of a ten-day period. The celebration occurred without reports of government harassment.

Public meetings were segregated by sex. Unless sponsored by diplomatic missions or approved by the appropriate governor, foreign residents who seek to hold unsegregated meetings risked arrest and deportation. The authorities monitored any large gatherings of persons, particularly women. The Mutawwa'in dispersed groups of women found in public places, such as restaurants. Government policy permits women to attend cultural and social events if accompanied by a father, brother, adult son, or husband; however, the policy was not consistently enforced.

The Government prohibited the establishment of political parties or any type of opposition group (see Section 3). However, until the arrest of reformers in March, groups of reform supporters and participants in the annual national dialogues submitted petitions to the Government on reform, women's rights, religious moderation, and public participation. In February 2003, the Government licensed a journalists' association, approved the establishment of a human rights organization, and announced plans to form a bar association (see Section 4). A large number of humanitarian organizations and tribal and professional societies exist licensed by the Government, such as the Saudi Chemists Society and the Saudi Pharmacists Society.

c. Freedom of Religion

The Government does not provide legal protection for freedom of religion and such protection did not exist in practice. Freedom of religion did not exist. Islam is the official religion, and the law provides that all citizens must be Muslims.

The Government prohibited the public practice of non-Muslim religions. In general, non-Muslims are able to worship privately, but must exercise great discretion to avoid attracting attention. Conversion by a Muslim to another religion was considered apostasy. Apostasy is a crime under Shari'a and, according to the Government's interpretation, is punishable by death. On October 31, a citizen was arrested in Hofuf and jailed. International NGO and local media reports claimed that he had converted to Christianity. No further information on him or his case was available at year's end.

The Shi'a Muslim minority (approximately 2 million of approximately 26.7 million citizens) lived mostly in the Eastern Province, although a significant number also resided in Medina in the Western Province. Its members were subjected to officially sanctioned political, social, and economic discrimination (see Section 5).

The Government permitted the celebration of the Shi'a holiday of Ashura in the eastern province city of Qatif. The police monitored the celebrations. No other public Ashura celebrations were permitted in the country, and many Shi'a traveled to Qatif or to Bahrain to participate in Ashura celebrations. The Government continued to enforce other restrictions on the Shi'a community, such as banning Shi'a books.

The Government issued permits to construct Shia mosques, and a new mosque was constructed in Qatif. The Shi'a have declined government offers to build state-supported mosques because the Government would prohibit the incorporation and display of Shi'a motifs in any such mosques.

Magic was widely believed in and sometimes practiced; however, under the Government's interpretation of Shari'a, the practice of magic was regarded as the worst form of polytheism, an offense for which no repentance was accepted, and which was punishable by death. There were an unknown number of detainees held in prison on the charge of "sorcery" or the practice of "black magic" or "witchcraft." The press reported several cases in which police arrested persons accused of sorcery, including a case in September in which three African women were arrested in Jeddah. There were reports of Shi'a Ismailis (Seveners) in Najran charged with practicing magic; however, the Shi'a Ismailis maintained that their practice adheres to the Seveners interpretation of Islam. There was no information available on prison time or punishment.

Significant numbers of Sufis in the Western Province engaged in technically illegal practices, such as celebrating the Mawlid, or Prophet's birthday, without government interference. The practice of other schools of Sunni Islam was discouraged, and adherents of the Shi'a branch of Islam faced institutionalized discrimination, including restrictions on religious practice and on the building of mosques and community centers.

The Government prohibited public non-Muslim religious activities. Non-Muslim worshippers risked arrest, lashing, deportation, and torture for engaging in overt religious activity that attracted official attention. The Government did not provide explicit guidelines, such as the number of persons permitted to attend and acceptable locations, for determining what constitutes private worship, which made distinctions between public and private worship unclear. Such lack of clarity, as well as instances of arbitrary enforcement by the authorities, forced most non-Muslims to worship in such a manner as to avoid discovery by the Government or others. Authorities deported those detained for non-Muslim worship, almost always after lengthy periods of arrest.

There were reports that Christians were detained for practicing their religion. During the year, there were scattered raids, arrests, and detentions of Christians throughout the country, although fewer than in the past. In February, the Government deported a resident Christian after he provided an Arabic Bible to a citizen. In November, the Government deported an Indian Christian arrested in April. There were credible reports that Mutawwa'in arrested him for religious reasons after a dispute with his employer. According to other reports, the Mutawwa'in beat him on the day of the arrest and confiscated his personal property, including two Bibles, compact disks, a personal computer, and religious videos.

The Government did not officially permit non-Muslim clergy to enter the country for the purpose of conducting religious services, although some came under other auspices. Such restrictions made it very difficult for most non-Muslims to maintain contact with clergymen and attend services. Catholics and Orthodox Christians, who require a priest on a regular basis to receive the sacraments required by their faith, particularly were affected.

Proselytizing by non-Muslims, including the distribution of non-Muslim religious materials such as Bibles, was illegal. Muslims or non-Muslims wearing religious symbols of any kind in public risked confrontation with the Mutawwa'in.

Under the Hanbali interpretation of Shari'a law, judges may discount the testimony of persons who are not practicing Muslims or who do not adhere to the correct doctrine.

Islamic religious education was mandatory in public schools at all levels. All students received religious instruction, which generally was limited to that of the Hanbali school of Islam.

In accordance with the religious establishment's interpretation of Shari'a, women were prohibited from marrying non-Muslims, but men were permitted to marry Christians and Jews, as well as Muslims.

The Government required noncitizens to carry Iqamas, or legal resident identity cards, which contained a religious designation for "Muslim" or "non-Muslim." There were reports that individual Mutawwa'in pressured Saudi sponsors not to renew Iqamas, which had been issued for employment, of individuals for religious reasons.

During the holiday season, the press reported that shopkeepers in Riyadh sold Christmas cards under the counter. During the year, the Committee prohibited the sale of cards and flowers for exchange on Valentine's Day

In March, the press reported that a schoolteacher on trial for apostasy was convicted of blasphemy and sentenced to three years in jail and 300 lashes. The teacher was banned from teaching and writing in the press. The court dropped the original charge of apostasy.

There are no public places of worship for non-Muslims in the country. While significant numbers of Christians reside in the country, there are very few Jews. There exist no synagogues or churches in the country, and, while there have been no specific reports of physical violence against, or harassment of Jewish people, there have been numerous reports of violence against and harassment of Christians.

There were frequent instances in which mosque preachers, whose salaries are paid by the Government, used strongly anti-Jewish language in their sermons. Although this language declined in frequency since the May 2003 attacks in Riyadh, there continued to be instances in which mosque speakers prayed for the

death of Jews, including from the Grand Mosque in Mecca and the Prophet's Mosque in Medina.

Anti-Semitic sentiments were present in the print and electronic media. For example, in an article in the May 1 issue of "The Muslim Soldier" published by the Religious Affairs Department of the Saudi Armed Forces, the author wrote that the fabricated Torah, Talmud, and Protocols of the Elders of Zion command the destruction of all non-Jews in order to achieve their goal of world domination. The local press rarely printed articles or commentaries disparaging other religions.

NGOs have reported on intolerance in the education system and, in particular on the presence of anti-Semitic content in some school textbooks. Authorities have taken measures to address these concerns, including in 2003 the wholesale revision of textbooks to remove content disparaging religions other than Islam.

The official tourism website stated that Jews were banned from entering the country; however, it was not enforced in practice. On March 1, the Government removed this statement from the site replacing it with a statement regretting "any inconvenience this may have caused."

December 14 was "security day" in all schools in Riyadh to "educate against extremism and terrorism."

For a more detailed discussion, see the 2004 International Religious Freedom Report.

d. Freedom of Movement Within the Country, Foreign Travel, Emigration, and Repatriation

Citizen men have the freedom to travel within the country and abroad; however, the Government restricted these rights for women based on its interpretation of Islamic Law. All women in the country were prohibited from driving and were dependent upon males for transportation. Likewise, they must obtain written permission from a male relative or guardian before the authorities would allow them to travel abroad (see Section 5). The requirement to obtain permission from a male relative or guardian applied also to foreign women married to citizens or to the minor and single adult daughters of Saudi fathers. Since 2001, women have been able to obtain their own identity cards; however, the Government required that they obtain permission to receive a card from a male relative or guardian (see Section 5).

The restrictions on travel also applied to foreign citizen children of citizen fathers. In cases where there were custody disputes between foreign citizen women and their citizen husbands, the husband was able to prevent the travel of the children out of the country. These restrictions on travel can continue even after female children reach adulthood, although the Government has worked with foreign consular officials to overcome a father's or husband's refusal to permit the travel of adult foreign citizen female relatives. During the year, senior officials considered, on a case-by-case basis, allowing adult foreign citizen women to travel despite objections by their husbands, fathers, or other male relatives or guardians.

Foreigners typically were allowed to reside or work in the country only under the sponsorship of a citizen or business. The Government required foreign residents to carry identification cards. It did not permit foreigners to change their workplace without their sponsor's permission.

During the year, the Government began providing citizenship under Article 9 of the law on naturalization to some of the thousands of native residents who live in the country without possessing citizenship of any nation. They are collectively known as "Bidoons" ("without" in Arabic). These are native-born residents who lack citizenship due to an ancestor's failure to obtain Saudi nationality, including descendents of nomadic tribes such as the Anaiza and Shammar, whose ancestors were not counted among the native tribes during the reign of the Kingdom's founder, King Abd al- Aziz; descendants of foreign-born fathers who emigrated to the country before citizenship was institutionalized; and rural migrants whose parents failed to register their births. Because of their lack of citizenship, they were denied employment and educational opportunities, and had a limited ability to travel. Bidoons are among the poorest residents of the country, and reside at the margins of society.

The law prohibits employers from retaining foreign workers' passports. However, some sponsors often retained possession of foreign workers' passports, although some classes of foreign workers were allowed to keep their passports. Foreign workers must obtain permission from their sponsors to travel abroad. If sponsors were involved in a commercial or labor dispute with foreign employees, they may ask the authorities to prohibit the employees from departing the country until the dispute is resolved. Some sponsors used this as a pressure tactic to resolve disputes in their favor or to have foreign employees deported. There were reports of the Government prohibiting foreign employees involved in labor disputes from departing the country until the dispute was resolved (see Sections 5 and 6.c.).

The Government seized the passports of all potential suspects and witnesses in criminal cases and suspended the issuance of exit visas to them until the case was concluded. As a result, some foreign nationals were forced to remain in the country for lengthy periods against their will. The authorities sometimes confiscated the passports of suspected oppositionists and their families.

Citizens may emigrate. The Government prohibited dual citizenship; however, children who hold other citizenship by virtue of birth abroad increasingly were permitted to leave the country using non-Saudi passports. In October, the Government passed a new citizenship law by which long-term residents and other foreigners could obtain citizenship. The Government imposed travel bans on some of the reformers arrested in March (see Sections 1.d. and 1.e.).

The Government did not use forced exile; however, it previously revoked the citizenship of opponents of the Government who reside outside the country (see Section 3). In addition, the Government has revoked the rights of some citizens to travel outside the country. In several cases, it has done so for political reasons without notifying the individual or providing opportunities to contest the document.

The law does not provide for the granting of asylum or refugee status in accordance with the 1951 U.N. Convention Relating to the Status of Refugees or its 1967 Protocol, but the Government has established a system for providing protection to refugees. The Government cooperated with the office of the U.N. High Commissioner for Refugees in assisting refugees and asylum seeker. The Basic Law provides that "the state will grant political asylum, if so required by the public interest."

The Deputy Representative in the Gulf Cooperation Council States of the U.N. High Commissioner for Refugees(UNHCR) reported that approximately 400 Iraqi refugee families still reside at the Rafha refugee camp situated a few miles from the Saudi-Iraqi border. The Government has underwritten the entire cost of providing safe haven to the Iraqi refugees and continued to provide logistical and administrative support to the UNHCR and other resettlement agencies. The UNHCR has monitored more than 3,000 persons voluntarily returning to Iraq from Rafha since December 1991 and found no evidence of forcible repatriation (see Section 1.c.). Citing security concerns, UNHCR was no longer facilitating the organized repatriation of Iraqi refuges.

There were no reports of the forced return of persons to a country where they feared persecution.

Section 3 Respect for Political Rights: The Right of Citizens to Change Their Government

Citizens do not have the right to change their Government. The Basic Law states that the Government is established on the principal of "Shura" or consultation, and requires the King and Crown Prince to hold open majlises. The Basic Law states that all individuals have the right to communicate with public authorities on any issue. There were no formal democratic institutions, and only a few members of the ruling family had a voice in the choice of leaders or in changing the political system. The Government ruled on civil and religious matters within limitations established by the Basic Law, religious law, tradition, and the need to maintain consensus among the ruling family and religious leaders.

The King serves as Prime Minister, with the Crown Prince as First Deputy Prime Minister. The King appoints all other ministers, who in turn appoint subordinate officials with cabinet concurrence.

On November 23, voter and candidate registration for the country's first nationwide municipal elections began for male citizens only. Members of the armed forces may not vote; however, prison inmates were permitted to do so. Of the 178 municipal districts in the country, 50 percent of 4-year term municipal council seats will be elected, and 50 percent will be appointed.

The Majlis al-Shura, or Consultative Council, consists of 120 appointed members and is divided into 11 committees. It was created in 1992 by King Fahd, and, in the past year has taken on an increasingly important political role. The Majlis reviewed and voted on legislation and often suggested amendments to the Government. The Government generally accepted amendments made by the Majlis. The Majlis held hearings with some government officials to review the performance of their ministries and has the power to request documents from government ministries.

The Council of Senior Islamic Scholars (Ulema) is another advisory body to the King and the Cabinet. It reviews the Government's public policies for compliance with Shari'a. The Government viewed the Council as an important source of religious legitimacy and took the Council's opinions into account when promulgating legislation.

Communication between citizens and the Government traditionally has been expressed through client-patron relationships and by affinity groups such as tribes, families, and professional hierarchies. In theory, any male citizen or foreign national may express an opinion or a grievance at a majlis, an open-door meeting held by the King, a prince, or an important national or local official. During the year, Crown Prince Abdullah held a variety of meetings with citizens throughout the country. Ministers and district governors can be approached for discussion at a majlis, which were held on a regular basis.

In April 2003, a group of Shi'a submitted a petition to the Crown Prince calling for reforms and drawing attention to the discrimination against the country's Shi'a minority. In December 2003, a group of citizen intellectuals and citizen women sent two separate petitions to the Crown Prince in response to the pace of reform efforts. One petition called for a constitutional monarchy, while the petition submitted by over 300 women called for greater rights for women in the country and greater recognition of their contributions to society. After the March arrest of the reformers, there were no further petitions.

The extremist Committee for the Defense of Legitimate Rights (CDLR), established in 1993, and its splinter group, MIRA, established in 1996, continued to criticize the Government, using the Internet and satellite radio stations. On December 16, police arrested 21 persons for taking part in an anti-government protest sponsored by MIRA in Jeddah. In December, the U.S. designated MIRA's leader, Sa'ad al-Faqih, a supporter of international terrorism. At year's end, the detainees were awaiting trial (see Sections 1.d. and 2.b.).

Following an October 2003 demonstration in Riyadh, hundreds of citizens gathered October 23 in Riyadh, Jeddah, Dammam, and Ha'il. The Government arrested most of the demonstrators, detained many of them for a period of time without sentencing, then sentenced most to varying sentences ranging from imprisonment to flogging, although, at year's end, there were no reports that the sentences had been commuted (see Sections 1.d. and 2.b.).

There was a widespread public perception of corruption by some members of the royal family and in the executive branch of the Government. The absence of transparency in government accounts and in decision-making encouraged this perception. There are no laws providing for public access to government information. Women continued to have no formal role in government and politics, despite increased public dialogue on the issue. In November, women participated in a gender-segregated election of the Chambers of Commerce and Industry. Participation by women in a majlis was restricted, although some women sought redress through female members of the royal family. On several occasions, women have been called to advise members of the Majlis al-Shura in private, closed-door sessions. There continued to be women's' councils to advise local governors on issues concerning women. There were no women or religious minorities in the Cabinet, and only 2 of the 120-member Majlis al-Shura were Shi'a.

Section 4 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

The Government disagreed with internationally accepted definitions of human rights and viewed its interpretation of Islamic law as the only necessary guide to protect human rights. Unlike in last year when for the first time an international human rights group visited the country, there were no visits during the year.

The human rights NGO Human Rights First-–the Society for Protecting and Defending Human Rights in the Kingdom of Saudi Arabia--continued to operate without official government recognition.

On March 9, the King authorized the creation of the government-patronized National Society for Human Rights (NSHR), which characterized itself as a national nongovernmental organization that has no affiliation with governmental institutions. According to its chairman, who was himself a member of the government-appointed Shura council, none of its members had ties to the executive branch of the Government; they were consultants, professors and retirees. Ten of its 41 members were women. In practice, the Society did not exercise full independence from the Government. In December, the press reported that a Jeddah branch of the office had begun hearing human rights complaints. The report stated that the NSHR handled more than 500 complaints, including "political injustices, administrative corruption, and reports by expatriate workers alleging abuse." The report also noted that citizens' complaints against government bodies comprised 25 percent of the 519 cases, and foreign workers lodged 17 percent of the cases. There was no additional information as to the other complaints.

Section 5 Discrimination, Societal Abuses, and Trafficking in Persons

There was legal and systemic discrimination based on gender. The law prohibits discrimination based on race, but not nationality, although such discrimination occurred. The Government and private organizations cooperated in providing services for persons with disabilities; however, there is no legislation mandating public access. The Shi'a minority suffered social, legal, economic, and political discrimination (see Section 2.c.).

In 2003, the press reported that approximately 1,500 citizens were infected with HIV/AIDS (approximately 23 percent were women). In November, the press reported that the number of HIV/AIDS cases reported in the Kingdom increased by 100 percent. The most common form of contracting the disease was through sexual intercourse; however, the article mentioned the transfer through needle sharing and the treatment of "Hijwah." "Hijwah" is a superstitious medical practice in society that withdraws "bad blood" that may contain illnesses. The article also focused on the social stigma surrounding AIDS and the lack of public education on the issue. In 2003, the Ministry of Health began producing brochures on the illness and started group therapy and awareness programs. In December, the Government sponsored a 2-day conference in Jeddah to raise awareness of the problem in the country.

Women

In June, the National Dialogue conference endorsed the principle that there should be an expansion of women's role in public life, in addition to reexamining restrictions imposed by custom or tradition rather than Islam. In December 2003, the National Dialogue held its second session, and 10 women participated for the first time.

There were several developments related to women's participation in business, including the opening by the Saudi Arabian General Investment Authority (SAGIA) of an all-female investment center in Riyadh to facilitate investment in local businesses by citizen and foreign women. On January 12, the Government introduced a new locally based satellite news-channel, "Al-Akhbaria," which included six female newscasters on the staff. For the first time in 2003, the Jeddah Economic Forum devoted an entire day to discussing the role of women in domestic and international business.

In October, the Government amended the law on nationality establishing new citizenship rules for women. Under the new law, women may keep citizenship or acquire that of a citizen husband who has acquired another citizenship. Wives of naturalized citizens may also acquire citizenship if resident in the country and willing to relinquish their original nationality. If a citizen woman marries a foreigner and chooses to acquire her husband's citizenship, she will lose Saudi citizenship. Finally, the foreign wife or widow of a citizen will qualify for citizenship if she gives up her original nationality.

During the year, there was increased attention in the press to women's issues, including questions such as gender discrimination, domestic abuse, health, rising divorce rates, employment, driving, and legal problems women face doing business. Despite great debate in the press and in the media, at year's end, women were not granted permission to participate in the municipal elections.

Shari'a prohibits abuse and violence against all innocent persons, including women; although the Government did not keep statistics on spousal abuse or other forms of violence against women, based on the information available regarding physical spousal abuse and violence against women, such violence and abuse appeared to be common problems. Hospital workers reported that many women were admitted for treatment of injuries that apparently resulted from spousal violence; hospitals now are required to report any suspicious injuries to authorities. A citizen may prevent his wife and any child or unmarried adult daughter from obtaining an exit visa to depart the country, regardless of nationality (see Section 2.d.).

Foreign embassies continued to receive many reports that employers abused foreign women working as domestic servants. Some embassies of countries with large domestic servant populations maintained safe houses to which their citizens may flee to escape work situations that included forced confinement, withholding of food, beating and other physical abuse, and rape. Often the reported abuses were committed by female citizens. During the year, the media reported more frequently on cases involving domestic abuse of women, servants, and children. However, in general, the Government considered such cases to be family matters and did not intervene unless charges of abuse were brought to its attention. It was almost impossible for foreign women to obtain redress in the courts due to the courts' strict evidentiary rules and the women and servants' own fears of reprisals. During the year, there were increasing reports of employers being punished for abuse of domestic servants.

By religious law and social custom, women have the right to own property and are entitled to financial support from their husbands or male relatives. However, women have few political or social rights and

were not treated as equal members of society. There were no active women's rights groups. Women may not legally drive motor vehicles and were restricted in their use of public facilities when men were present. Women must enter city buses by separate rear entrances and sit in specially designated sections. Women risked arrest by the Mutawwa'in for riding in a vehicle driven by a male who was not an employee or a close male relative.

The law provides that women may not be admitted to a hospital for medical treatment without the consent of a male relative; however this was not generally enforced. By law and custom, women may not undertake domestic or foreign travel alone (see Section 2.d.). During the year, the Government continued to issue national identity cards to females, despite a national campaign by some religious conservatives against it.

In public, a woman was expected to wear an abaya (a black garment that covers the entire body) and also to cover her head and hair. The Mutawwa'in generally expected Muslim women to cover their faces and women from other countries in Asia and Africa to comply more fully with local customs of dress than did non-Muslim Western women. Nonetheless, in recent years the Mutawwa'in have instructed Western women to wear the abaya and cover their hair. During the year, Mutawwa'in continued to admonish and harass women to wear their abayas and cover their hair. In 2003, a Mutawwa sexually assaulted a female expatriate, although, at year's end, there was no indication that he was punished.

Restrictions continued on accredited female diplomats that did not apply to their male counterparts. For example, single females must receive exception letters from their embassies in order to stay at a hotel. Some official functions were restricted to male or female participants only.

Women also were subject to discrimination under Shari'a as interpreted in the country, which stipulates that daughters receive half the inheritance awarded to their brothers. While Shari'a provides women with a basis to own and dispose of property independently, women often were constrained from asserting such rights because of various legal and societal barriers, especially regarding employment and freedom of movement. In a Shari'a court, the testimony of one man equals that of two women (see Section 1.e.). Although Islamic law permits polygamy, with up to four wives, it was becoming less common due to demographic and economic changes. Islamic law enjoins a man to treat each wife equally. In practice, such equality was left to the discretion of the husband. The Government placed greater restrictions on women than on men regarding marriage to noncitizens and non-Muslims (see Section 1.f.).

Women must demonstrate legally specified grounds for divorce, but men may divorce without giving cause. In doing so, men were required to pay immediately an amount of money agreed upon at the time of the marriage, which serves as a one-time alimony payment. Women who demonstrate legal grounds for divorce still were entitled to this alimony. If divorced or widowed, a Muslim woman normally may keep her children until they attain a specified age: 7 years for boys and 9 years for girls. Children over these ages were awarded to the divorced husband or the deceased husband's family. Numerous divorced foreign women continued to be prevented by their former husbands from visiting their children after divorce.

Women had access to free but segregated education through the university level. They constituted more than 58 percent of all university students but were excluded from studying such subjects as engineering, journalism, and architecture. Men may study overseas; the law provides that women may do so only if accompanied by a spouse or an immediate male relative. However, this restriction was not enforced in practice, and many women studied overseas without a guardian.

Women made up approximately 5 percent of the formal citizen work force. Unemployment among women was approximately 8 percent. Most employment opportunities for women were in education and health care. Despite limited educational opportunities in many professional fields, some female citizens were able to study abroad and return to work in professions such as architecture, law, and journalism. Many foreign women worked as domestic servants and nurses.

Women who wished to enter nontraditional fields were subject to discrimination. Women may not accept jobs in rural areas if there are no adult male kin present with whom they may reside and who agree to take responsibility for them. Most workplaces in which women were present were segregated by gender. Frequently, contact with male supervisors or clients was allowed only by telephone or fax machine. However, the degree of segregation varied by region, with the central region having the most restrictions and the eastern and western regions being more relaxed. Despite gender segregation, the law provides women the right to obtain business licenses for work in fields that might require them to supervise foreign workers, interact with male clients, or deal on a regular basis with government officials. However, in hospital settings and in the energy industry, women and men worked together, and, in some instances, women supervised male employees. Some women and men continued to seek opportunities for women

and to break down gender segregation.

Prostitution is illegal. Some women were trafficked for the purpose of prostitution; however, the problem was not widespread (see Section 5, Trafficking).

Children

The Ministry of Education continued to teach children their rights under the U.N. Convention on the Rights of Children.

The Government provided all children with free education and medical care. Children were segregated by sex in schools, usually beginning at the age of 7; however, schools were integrated through the fourth grade in some areas. According to the U.N. Development Program (UNDP), in 2000-01, net primary enrollment for girls was 56 percent and for boys was 61 percent. In 1999-2000, 94 percent of those children of each sex who had started grade 1 had reached grade 5.

Abuse of children was a problem, although it was difficult to gauge the prevalence of child abuse, since the Government kept no national statistics on such cases. Although in general the culture greatly prizes children, studies by citizen female doctors indicated that severe abuse and neglect of children appeared to be more widespread than previously reported. The press has also played an important role in beginning to raise national consciousness about the widespread problem.

In 2003, the Ministry of Interior's Center for Crime Prevention and Research reported that 21 percent of male children suffered from some form of abuse. The report stated that 33.6 percent of the abused, suffered from some sort of psychological abuse and 25.3 percent suffered physical abuse. The figures excluded female children and accusations of sexual abuse, as the Ministry stated that the issues were too sensitive for public discussion.

Trafficking in Persons

The country does not have an anti-trafficking law, although most forms of trafficking are criminalized under existing statutes. Domestic laborers are not protected under the country's labor law. The majority of cases involving trafficking were settled out of court by mediation and settlements.

During the year, the Government acknowledged trafficking problems in terms of abuse of domestic servants, especially female expatriate workers. The press carried a number of stories on the abuse of maids and other domestic workers, including the prosecution and punishment of citizen employers who abused domestic employees. During the year, the Ministry of Labor formed an internal committee that was preparing an educational program to advise foreign domestic workers of their rights for recourse to authorities if they experience abuse or nonpayment of wages.

On July 4, the Ministry of Labor issued Decree 738/1 which states that "all forms of trafficking in persons such as trading in visas, generating revenues from employing workers, charging fees for the renewal of entry, exit visas and residency permits, violating conditions of contracts, inhumane and unethical use of workers, child labor, abuse and recruitment for begging are totally prohibited."

Among the millions of foreign workers in the country, some persons, particularly domestic workers, were defrauded by employment agencies or exploited by employers; some workers overstay their contracts and are exploited as they have few legal protections. Many foreign domestic servants fled work situations that included forced confinement, beating and other physical abuse, withholding of food, and rape. Police academies have implemented a course for new officers on how to handle labor issues as part of their standard curriculum.

During the year, the authorities disrupted a cross-border (Yemen-Saudi Arabia) child smuggling ring and arrested a man on charges of smuggling maids into Jeddah to work for a brothel, the first reported case of trafficking for sexual exploitation in the country.

The Government operated shelters in the three largest cities for abused female workers, including some trafficking victims. Trafficking victims faced disincentives to seek the prosecution of their employer for trafficking; victims must first file a police report before going to the government shelters if they are party to a criminal complaint. In Dammam, the Government established a Social Welfare office for foreign workers with complaints. The Government worked with several Islamic charities to provide long term care for abandoned children, including those who have been trafficked for forced begging (see Section 6.c.).

Persons with Disabilities

The law provides hiring quotas for persons with disabilities. There is no legislation that mandates public accessibility; however, newer commercial buildings often included such access, as did some newer government buildings. The provision of government social services increasingly has brought persons with disabilities into the public mainstream. The Government and private charitable organizations cooperated in education, employment, and other services for persons with disabilities.

During the year the Government took a variety of steps promoting more rights and elimination of discrimination against persons with disabilities. The Government established an endowment committee for children with disabilities, and a supreme council to deal with the affairs of the disabled with the Crown Prince as chairman. Foreign criminal rings reportedly bought and imported children with disabilities for the purpose of forced begging (see Sections 6.c. and 6.f.). There were numerous government-sponsored centers for persons with disabilities, including organizations for children with Down's syndrome and autism.

Police generally transported persons with mental disabilities found wandering alone in public to their families or a hospital. Police claimed that, according to Islam, family members should be taking care of such individuals.

The Crown Prince and other members of the royal family sponsored events during the year benefiting the handicapped.

National/Racial/Ethnic Minorities

Although racial discrimination is illegal, there was substantial societal prejudice based on ethnic or national origin. Foreign workers from Africa and Asia were subject to various forms of formal and informal discrimination and have the most difficulty in obtaining justice for their grievances. For example, pay scales for identical or similar labor or professional services were set by nationality such that two similarly qualified and experienced foreign nationals performing the same employment duties received varied compensation based on their nationalities.

Section 6 Worker Rights

a. The Right of Association

The law does not address freedom of association. The Government prohibited the establishment of labor unions; however, since 2001, the Government has permitted the establishment of labor committees for citizens in local companies, including factories, having more than 100 employees. The aim is to facilitate communication between employees and employers and the improvement of work standards in the workplace. The labor committees consist of 3 to 9 members who serve 3-year terms. The committee members are chosen by the workers and approved by the Ministry. The committee may make recommendations to company management to improve work conditions, increase productivity, improve health and safety, and recommend training programs. The Ministry of Labor and Social Affairs may send a representative to attend committee meetings. A committee must provide a written report of its meetings to company management, which also is transmitted to the Ministry. The Ministry may dissolve a labor committee if it violates regulations or threatens public security. No committees existed by year's end. Foreign workers may not serve on the committee; however, committee regulations provide that the committee should represent their views.

b. The Right to Organize and Bargain Collectively

The Law does not provide for collective bargaining. Collective bargaining remained prohibited. Foreign workers comprised approximately two-thirds of the work force. There was no minimum wage; wages were set by employers and varied according to the type of work performed and the nationality of the worker (see Section 5).

Strikes were prohibited; however, there were several cases in which factory workers in Jeddah staged strikes to protest unpaid wages. The press reported in September 2003 that over 500 foreign workers had not been paid for 18 months, nor had they had their residents permits renewed.

There are no export processing zones.

c. Prohibition of Forced or Bonded Labor

The law prohibits forced or bonded labor; however, employers had significant control over the movements of foreign employees, which gave rise to situations that sometimes involved forced labor, especially in remote areas where workers were unable to leave their place of work.

The law does not specifically prohibit forced or bonded labor by children, but it was not a problem, with the rare exception of forced child begging rings, and possibly family businesses. During the year, the authorities disrupted a cross border child smuggling ring and arrested a man on charges of smuggling maids in Jeddah to work for a brothel (see Section 5).

Some sponsors prevented foreign workers from obtaining exit visas to pressure them to sign a new work contract or to drop claims against their employers for unpaid salary (see Section 2.d.). Additionally, some sponsors refused to provide foreign workers with a "letter of no objection" that would allow them to be employed by another sponsor.

There were many reports of workers whose employers refused to pay several months, or even years, of accumulated salary or other promised benefits. More foreign workers than in the past went to labor courts, which regularly ruled in favor of the workers. However, this was a long and difficult process and it was difficult to enforce judgments. Labor courts, while generally fair, may take many months to reach a final appellate ruling, during which time the employer may prevent the foreign laborer from leaving the country. An employer also may delay a case until a worker's funds were exhausted, and the worker was forced to return to his home country.

d. Prohibition of Child Labor and Minimum Age for Employment

The minimum age for employment is 13 years, which the Ministry of Labor may waive with the consent of the juvenile's guardian. There is no minimum age for workers employed in family-owned businesses or in other areas that are construed as extensions of the household, such as farming, herding, and domestic service.

Children under the age of 18 may not be employed in hazardous or harmful industries, such as mining or industries employing power-operated machinery. While there is no formal government entity responsible for enforcing the minimum age for employment of children, the Ministry of Justice has jurisdiction and has acted as plaintiff in the few cases that have arisen against alleged violators. However, in general, children played a minimal role in the work force.

The majority of child beggars were citizens, many of them girls with disabilities, according to an ILO study reported in 2002. The Ministry maintained special offices in both Mecca and Medina to combat the growing problem of child beggars.

The law does not prohibit specifically forced or bonded labor by children, but it was not a problem, with the rare exception of forced child begging rings, and possibly family businesses (see Section 6.c.). The Government implemented a regulation requiring that all camel jockeys be at least 18 years of age, and there were indications that it was enforced.

e. Acceptable Conditions of Work

There is no legal minimum wage. Labor regulations establish a 48-hour workweek at regular pay and allow employers to require up to 12 additional hours of overtime at time-and-a-half pay. Labor law provides for a 24-hour rest period, normally on Fridays, although the employer may grant it on another day. The average wage generally provided a decent standard of living for a worker and family. Official unemployment numbers varied; however, the Riyadh Chamber of Commerce and Industry announced that, as of October 2003, unemployment among 15-29 year olds was 17 percent of men and 30 percent of women. They also stated that unemployment within the citizen population was expected to reach 30 percent within 3 years if current trends held.

The law prohibits employers from holding their employees' passports without the employee's consent; however, this law was not widely known throughout the country.

Workers risked losing employment if they removed themselves from hazardous work conditions.

Labor regulations require employers to protect most workers from job-related hazards and disease. However, foreign nationals reported frequent failures to enforce health and safety standards. Farmers, herdsmen, domestic servants, and workers in family-operated businesses were not covered by these

regulations.

Some foreign nationals who have been recruited abroad claimed that, after their arrival in the country, they were presented with work contracts that specified lower wages and fewer benefits than originally promised. Other foreign workers reportedly signed contracts in their home countries and later were pressured to sign less favorable contracts upon arrival. Some employees reported that, at the end of their contract service, their employers refused to grant permission to allow them to return home. Foreign employees involved in disputes with their employers may find their freedom of movement restricted (see Section 2.d.).

The labor laws, including those designed to limit working hours and regulate working conditions, do not apply to foreign domestic servants, and such domestic servants may not seek the protection of the labor courts. There were credible reports that female domestic servants sometimes were forced to work 16 to 20 hours per day, 7 days per week. There were numerous confirmed reports of maids fleeing employers and seeking refuge in their embassies or consulates (see Section 5). Foreign embassies continued to receive reports of employers abusing domestic servants. Such abuse included withholding of food, beatings, and other physical abuse, and rape (see Section 5). During the year, the media continued to report stories of maids who had fled their place of employment.

The Government has established welfare shelters to house female domestic servants who flee their place of work. The Government offered arbitration between the worker and employer and investigated allegations of abuse. If no agreement could be reached, the maid was deported to her home country. In at least two publicized cases during the year, citizen employers were jailed for extreme abuse of domestic servants. During the year, the Grand Mufti warned citizens that Islam does not permit the oppression of workers regardless of their religion.

The ongoing campaign to remove illegal immigrants from the country has done little to Saudiize the economy because illegal immigrants largely worked in low-income positions, which most citizens considered unsuitable. The Government carried out the campaign by widely publicizing its enforcement of existing laws against illegal immigrants and citizens employing or sponsoring illegal immigrants.

The effect of the expeditious repatriation during the year of some illegal immigrants and the legalization of others has been to improve overall working conditions for legally employed foreigners. Illegal immigrants generally were willing to accept lower salaries and fewer benefits than legally employed immigrants. The departure or legalization of illegal workers reduced the competition for certain jobs and thereby reduced the incentive for legal immigrants to accept lower wages and fewer benefits as a means of competing with illegal immigrants. Furthermore, their departure or legalization removed a large portion of the class of workers most vulnerable to abuse and exploitation because of their illegal status.